Richard YATES, Appellant.

v.

COMMONWEALTH of Kentucky, Appellee.

No. 2012–SC–000275–MR.

Supreme Court of Kentucky.

Feb. 20, 2014.

Rehearing Denied June 19, 2014.

Shannon Renee, Dupree Assistant Public Advocate, Department of Public Advocacy, Frankfort, KY, for Appellant.

Jack Conway, Attorney General, Micah Brandon Roberts, Assistant Attorney General, Office of the Attorney General, Frankfort, KY, for Appellee.

Opinion of the Court by Justice NOBLE.

Appellant, Richard Yates, appeals his convictions for first-degree rape and first-degree sexual abuse. He alleges three errors: (1) that his due process rights were violated when the trial court denied his motion for a directed verdict on the charge of first-degree rape; (2) that the trial court abused its discretion when it admitted testimony about the Appellant's computer password; and (3) that the trial court abused its discretion when it denied defense counsel's request to cross-examine the victim about a prior inconsistent statement. For the reasons set forth herein, the Court reverses Appellant's convictions and sentence.

## I. Background

"Sally"[1] was a fourteen year-old high school freshman in 2010. She lived with her mother, her two brothers, and her stepfather, the Appellant. Also, significantly, Sally was dating an eighteen-year old upperclassman, Austin.

At the time of the sexual assault, Sally's mother worked the night shift at a local retail store and was often out of the family home during overnight hours. One evening in November 2010, while her mother was at work, Sally told Appellant she was going to a local park with some friends. Once at the park, Sally and her friends met up with Austin, Sally's boyfriend. At trial, Sally testified that she spent between an hour to an hour and a half at the park before returning home.

It is unclear from the record how Appellant discovered Sally's relationship with Austin but several nights after her trip to the park, Appellant confronted Sally about her older boyfriend. Initially, Appellant told Sally that her mother would not approve of her relationship with an older boy, and threatened to tell her mother about the relationship. He then stated that if he told her mother about the relationship, her boyfriend would go to jail for being in a relationship with Sally because she was a minor. The confrontation went on for several hours and Appellant escalated his threats as the night went on— eventually, telling Sally that Austin would go to jail and be "hurt" by other inmates once they found out he had been with a minor. At some time during the confrontation, Appellant told Sally that if she would "do something sexual" with him, he would, in exchange, not tell her mother about her relationship with Austin.

At trial, Sally testified Appellant had repeated his unsavory offer several times during the evening. She estimated Appellant had talked to her about her relationship with Austin for approximately one to two hours, and that between one to three hours elapsed between the time Appellant made his offer and the time, when the sexual assault occurred.

After Appellant made his offer, Sally thought about it for some time, and after growing concerned for her boyfriend decided to "do something sexual" with Appel-

---

1. Consistent with this Court's present practice, "Sally" is a pseudonym employed in this opinion to protect the minor victim's true identity to the extent possible. One of the issues in this case, however, revolves around a nickname for the victim, which cannot be discussed as a pseudonym.

lant. At trial, Sally testified that although she had said "yes" to having sex with Appellant, she had not been sure it was voluntary because she had only had sex with Appellant to protect her boyfriend. Indeed, at trial, she testified that she had refused sexual advances from Appellant on previous occasions,[2] but testified this time had been different because she believed Appellant when he had said Austin would go to jail and get hurt because of their relationship. Sally testified that she felt forced to have sex with the Appellant to protect Austin, but that she did not believe that the Appellant, himself, would physically hurt her boyfriend.

The sexual assault occurred in Appellant's bedroom. After deciding to have sex with Appellant, Sally entered the Appellant's bedroom in the middle of the night, and had sex with him. At trial, Sally testified that Appellant grabbed some kind of bottle from a nightstand, put his hands on it, and then put his hands down her pants and touched her genital area. Sally stated that the Appellant told her, "It was going to feel good, but that she wouldn't like it." Appellant then positioned Sally so that she was bent over the end of the bed on her stomach with her feet on the floor. She testified that Appellant then took something out of a plastic bag between the mattress and box springs of his bed and inserted it into her vagina. Sally did not see what the item was at the time. Appellant then removed the item from Sally's vagina, flipped her on her back and put her legs on his shoulders, and had sexual intercourse with her. After the encounter was over, Appellant told

Sally, "This was not going to happen again."

Sally testified that she told her mother and a friend about the sexual assault. Her friend ultimately believed Sally was telling the truth, but her mother did not. Some time thereafter, Sally moved out of the family home for a time, but eventually returned. Upon her return, Appellant and Sally began to argue regularly and Sally felt she couldn't stay at the home. In July 2011, Sally asked a friend's mother—Ginger Alexander—if she could stay with her on nights when Sally's mother was working. Alexander asked why she would make that request, and Sally told her about the sexual assault. Alexander encouraged Sally to report the incident to police, which she did. Local authorities took a statement from Sally and obtained a search warrant for the Appellant's residence. At the residence, local police recovered a sex toy in a plastic bag from between the mattress and box spring in Appellant's bedroom, several computers, as well as several other items.

Appellant was indicted on one count of first-degree rape, one count of first-degree sexual abuse, one count of unlawful transaction with a minor, and one count of being a persistent felony offender in the second degree. The case proceeded to trial on February 27, 2012, and the Appellant was convicted of one count of first-degree rape and one count of first-degree sexual abuse. He was sentenced to twenty-five years' imprisonment and now appeals his conviction and sentence as a matter of right pursuant to Section 110(2)(b) of the Kentucky Constitution.

2. Sally testified at trial that when she was thirteen years old, she had had inappropriate conversations with men on the internet. She further testified that when the Appellant found out about the conversations, he had written her a note saying that on a particular night she needed to wear a silky nightgown with nothing underneath and not to cover herself with blankets. Sally testified that she gave the note to her mother, and that her mother had confronted the Appellant. When confronted, the Appellant stated that he had only written the note in an attempt to see how far Sally would go to stay out of trouble.

## II. Analysis

### A. Directed Verdict Issue

█ Appellant's first argument on appeal is that the Commonwealth failed to produce sufficient evidence of the element of "forcible compulsion" as required for his conviction under KRS 510.040(1)(a),[3] and, thereby, the trial court committed reversible error by denying his motion for a directed verdict. The issue was not properly preserved for appeal,[4] and thus analysis must proceed under the palpable error rule, Criminal Rule 10.26, which states that an unpreserved error may be noticed on appeal when the error is both palpable and affects the substantial rights of a party to such a degree that manifest injustice results from the error.

In a criminal case, the U.S. Constitution requires the government to prove every element of the charged offense beyond a reasonable doubt. *Anderson v. Commonwealth,* 352 S.W.3d 577, 581 (Ky.2011) (citing *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); *Miller v. Commonwealth,* 77 S.W.3d 566, 576 (Ky. 2002); *see also* KRS 500.070(1)). Failure by the government to do so violates an accused's right to Due Process. *Id.* (citing *In re Winship,* 397 U.S. at 364, 90 S.Ct. 1068). After reviewing the record, this Court finds there was insufficient proof of the element of forcible compulsion, and to convict Appellant where there is such a failure of proof is a violation of his Due-Process rights and a manifest injustice under Criminal Rule 10.26. Accordingly, Appellant's conviction for first-degree rape must be reversed.

At the outset, the Court recognizes that the issues discussed in this case are difficult, and at times, controversial. Indeed, the factual circumstances of this case highlight the complexity and sensitivity of these issues and underscore their analytic difficulty.

A proper conviction for first-degree rape under KRS 510.040(1)(a)[5] requires the Commonwealth to show that the accused engaged in sexual intercourse with another person without the person's consent "by forcible compulsion." KRS 510.040(1)(a); *see also* KRS 510.020(1) (stating lack of consent is an element of every sexual offense defined in KRS Chapter 510); KRS 510.020(2) (stating lack of consent can be proved "by forcible compulsion"). "Forcible compulsion" is defined as "physical

---

**3.** KRS 510.040(1)(a) states:

(1) A person is guilty of rape in the first degree when:
 (a) He engages in sexual intercourse with another person by forcible compulsion; or
 (b) He engages in sexual intercourse with another person who is incapable of consent because he:
 1. Is physically helpless; or
 2. Is less than twelve (12) years old.
(2) Rape in the first degree is a Class B felony unless the victim is under twelve (12) years old or receives a serious physical injury in which case it is a Class A felony.

**4.** The trial record shows that while the Appellant moved for a directed verdict at the appropriate times, he failed to state specific grounds for his directed-verdict motion as required by Civil Rule 50.01. *See also Gibbs v. Commonwealth,* 208 S.W.3d 848 (Ky.2006). The Appellant made only a general motion for a directed verdict and the Commonwealth responded with a general recitation of the proof in the case. Appellant then stated specific grounds for a directed-verdict motion as to his unlawful transaction with a minor charge. Nevertheless, the trial court overruled the Appellant's motion on all charges, specifically mentioning the rape and sexual-abuse charges.

**5.** First-degree rape can also be shown when the victim is incapable of consenting because of physical helplessness or being less than twelve years old. KRS 410.040(1)(b). The Appellant could not be convicted under that provision because Sally was older than twelve years.

force or threat of physical force, express or implied, which places a person in fear of immediate death, physical injury to self or another person, fear of the immediate kidnap of self or another person, or fear of any offense under [KRS Chapter 510]." KRS 510.010(2).

As is evident from its definition, forcible compulsion may be shown in two broad ways: an act of physical force or a threat of physical force. Appellant, accordingly, makes a dual argument on appeal. First, he argues that the element of "forcible compulsion" was not met because the sexual intercourse was voluntary and any physical force exerted on the victim by Appellant was incidental to the voluntary sexual intercourse and therefore insufficient under the statute. The Commonwealth responds that Appellant's manipulation of Sally's body (i.e., positioning her on the bed and moving her legs) and the act of penetrating her vagina with his penis were sufficient "physical force" to satisfy the statute.

Second, Appellant contends his statements to the victim did not amount to a threat of physical force under the statute because he did not threaten to hurt the victim's boyfriend himself and that any threat of harm was not immediate enough to be a threat within the definitional scope of forcible compulsion. Again, the Commonwealth argues that because the boyfriend would impliedly be harmed without Sally's agreeing to sexual intercourse, the Appellant made a sufficient threat.

We will address each of Appellant's arguments separately. As such, our analysis into whether forcible compulsion was proven by sufficient evidence is largely segmented into two parts: (1) proof of "physical force," and (2) proof of a "threat of physical force." Before turning to those narrower issues, however, this Court must address an initial concern, namely, the statute's use of the word "by" in the phrase "by forcible compulsion."

### 1. By Forcible Compulsion

■ To understand the role and essential features of "forcible compulsion" in the context of sexual offenses, we must turn to KRS Chapter 510. At issue in this case is the offense first-degree rape as defined in KRS 510.040(1)(a). KRS 510.040(1)(a) provides that an individual commits first-degree rape when he "[engages] in sexual intercourse with another person *by* forcible compulsion." (Emphasis added.) From this definition, the Court recognizes an important distinction: an accused must engage in sexual intercourse "by" forcible compulsion. Forcible compulsion is evidence of lack of consent, which underlies all sexual offenses.

The word "by" as it is commonly used can signify that one action is the consequence of another or the means through which something is achieved. For example, if a person hurts his knee *by* falling down, it is understood that the injury to his knee occurred because he fell down, even though it was the stones on the ground that actually created the injury; the injury is the consequence of falling down. Or, using *by* the second way, a person could say that his knee was hurt *by* the stones on the ground, the stones being the means or direct cause of the injury. Either way, the use of the word "by" requires some sort of cause-effect relationship.

This understanding of "by" is vitally important in understanding how the phrase "by forcible compulsion" is used in Chapter 510 of the Kentucky Revised Statutes, specifically KRS 510.040(1)(a). If we insert this commonly understood definition of "by" into the language of KRS 510.040(1)(a), that statute can be read as stating an individual commits first-degree

rape when he "[engages] in sexual intercourse with another person [as a consequence of or by means of] forcible compulsion." Considering this reading of the statute, it is clear that forcible compulsion must be the means by which a defendant secures sexual intercourse with a victim for the conduct to qualify as first-degree rape. More precisely, considering the definition of forcible compulsion, the sexual intercourse must be the result of an act or threat of physical force *done by the defendant*. And, while every physical act employs some aspect of physical force in the scientific sense, not every physical act will be sufficient under the statute to constitute rape. Key to understanding lack of consent due to forcible compulsion is the fact that the sexual contact is compelled by force, either as a consequence of the force (threat or indirect cause of the contact) or directly by use of force in the contact.

And, as discussed above, forcible compulsion, which must be the means of effecting the sexual contact, can be accomplished in two ways: by physical force or by threat of physical force.

### 2. *Physical Force*

■ We have found that a defendant used forcible compulsion to commit sexual abuse by taking the victim's hand, without her consent, and placing it on the area of his pants over his penis. *Gibbs v. Commonwealth*, 208 S.W.3d 848 (Ky.2006), *overruled on other grounds by Padgett v. Commonwealth*, 312 S.W.3d 336 (Ky.2010). This is correct because he *directly compelled* her to touch him. The Commonwealth cites *Gibbs* as standing for the proposition that the simple act of touching can amount to lack of consent by forcible compulsion, and thus any physical contact with Sally was sufficient.

While it is true that an act as simple as grabbing someone's hand can amount to lack of consent by forcible compulsion giv-

en the right circumstances, not all touching will provide those circumstances. If that were the case, then every sex act between otherwise consenting adults would satisfy the elements of the first-degree rape statute, because there is always physical contact between them. Instead, the phrase "forcible compulsion" requires another factual element, namely, lack of consent by the victim, in the sense of lack of voluntariness or permissiveness. This is dictated by the use of the word "compulsion."

We recognized the role of the victim's permissiveness in a court's evaluation of forcible compulsion in *Gibbs*. In reaching our decision in that case, we compared the factual circumstances in *Gibbs* with those in *Miller v. Commonwealth*, 77 S.W.3d 566 (Ky.2002), a rape case in which we found no forcible compulsion. In *Miller*, we found insufficient proof of forcible compulsion because there was no testimony that physical force was used as a means to secure sexual intercourse with the victim, nor was there testimony that the victim was threatened to obtain sexual intercourse, or submitted to sexual intercourse out of fear of harm. Comparing the two cases we noted,

[In *Gibbs* ], Appellant's act of taking Sarah Smith's hand and placing it on his penis is required physical force and his intent was to cause the sexual contact between the two. Unlike the victim in *Miller*, Sarah Smith testified that Appellant forced her to touch his penis. Sarah Smith did not consent or contribute to the act of touching Appellant's penis; it was the sole act of Appellant that caused Sarah Smith's hand to be placed on Appellant's penis. Although there was no duress or resistance on Sarah Smith's part, forcible compulsion has no such requirement. It simply requires physical force or threat of physical force.

*Gibbs,* 208 S.W.3d at 856–57.

As evident from, our discussion in *Gibbs,* the evaluation of physical force is based on a victim's express non-consent, or other involuntariness, to a defendant's act. Thus, it may be in one case that a touch of the hand constitutes forcible compulsion while in another it does not.

It must be understood that a distinction exists between statutory lack of consent, as contemplated in KRS 510.020(3)(a), and consent in the sense of voluntarily going along with a sexual act. The analysis above does not erode the concept of statutory incapacity to consent in any way. This latter understanding of consent has been described as "willing participation," *Combs v. Commonwealth,* 198 S.W.3d 574, 578 (Ky.2006), which we have distinguished from legal consent in the sense of being capable of consent, *id.* 578 n. 2. "As used here, it means 'to willingly engage in' the activity." *Id.*

■ "Voluntary" consent, as applied in analyzing willingness to engage in an activity, does not imply that the act was consensual, but merely addresses whether a victim permitted the sexual act, or whether the defendant used physical force (or threat of physical force, discussed below) to procure sexual intercourse. The latter does not, of course, require resistance, earnest or otherwise, but the physical act must compel the victim and overcome the victim's volition.

■ The distinction between statutory consent and "voluntary" consent is significant because a victim's voluntary acquiescence to an accused's sexual act negates the element of forcible compulsion. A would-be victim's voluntary acquiescence renders any physical force used by the accused as incidental to sexual intercourse, rather than a means to secure sexual intercourse from the victim. Indeed, this is the very premise of what is sometimes referred to as "statutory rape": a victim under a certain age cannot consent in the statutory context, yet a victim may still voluntarily agree to a sexual act with a defendant, including any physical acts incidental to the sexual act.[6] Forcible compulsion is not an element of statutory rape.

Indeed, such a distinction is necessary to differentiate between degrees of rape of minors. For example, sex between an adult over the age of twenty-one and a fourteen year old is always a crime and is at least third-degree rape. *See* KRS 510.060. But if, as argued by the Commonwealth, any physical touching is sufficient to meet the element of forcible compulsion, then all such instances of adult-minor sex will be elevated to first-degree rape. That cannot, of course, have been the intent of the legislature, as it would render much of the third-degree rape statute superfluous.

The facts of the present case highlight the appropriateness of this analysis. At

---

**6.** This is why the Appellant has not claimed he was entitled to a directed verdict on his conviction for first-degree sexual abuse. A defendant commits first-degree sexual abuse by subjecting another person to sexual contact "by forcible compulsion" or, being more then twenty-one years old, when the other person is less than sixteen years old. KRS 510.110. The Appellant was convicted under an instruction defining abuse with respect to his and Sally's ages, not forcible compulsion.

Other instances of "statutory rape" are codified throughout KRS Chapter 510 in statutes making various sexual acts with minors illegal, regardless of whether force was used. For example, third-degree rape, of which the Appellant was no doubt guilty, is defined in KRS 510.060(1)(b) in part as follows: "A person is guilty of rape in the third degree when.... [b]eing twenty-one (21) years old or more, he or she engages in sexual intercourse with another person less than sixteen (16) years old...."

trial, Sally testified that she engaged in sexual intercourse with Appellant after he offered to not tell her mother about her relationship with her adult boyfriend if she would engage in sexual contact with him. Sally thought about Appellant's offer for approximately one to three hours, walked into Appellant's bedroom and told him she would accept his offer, and then engaged in sexual intercourse with him. The simple fact is that with respect to physical force, Sally voluntarily engaged in sexual intercourse with the Appellant, and the physical sex act was not forcibly compelled. While Sally was statutorily incapable of consent because of her age, and thus Appellant could certainly have been convicted of third-degree rape [7] and possibly unlawful transaction with a minor, the Appellant did not exercise physical force sufficient to commit first-degree rape. Consequently, the Appellant cannot be convicted of first-degree rape by means of physical force against the victim.

### 3. *Threat of Physical Force*

■ However, Appellant did use a threat to gain the voluntary submission of the victim, and there can be little doubt that she acquiesced to his sexual demands because of that threat, based on the record. Specifically, he threatened to report her adult boyfriend to the police, which would lead to the boyfriend going to jail where he would be hurt by other inmates. Appellant also contends that he was entitled to a directed verdict of acquittal for first-degree rape based on the *threat of physical force* because he did not threaten to use physical force against Appellant or her boyfriend.

A determination of what threats satisfy the definition of forcible compulsion requires a close reading of KRS 510.010(2). Under KRS 510.010(2), "forcible compulsion" as a threat is shown by a "threat of physical force, express or implied, which places a person in fear of immediate death, physical injury to self or another person, fear of the immediate kidnap of self or another person, or fear of any offense under this chapter." KRS 510.010(2). The alleged threat in the present case did not involve a threat of another sexual offense or fear of an immediate kidnapping. Thus, the Commonwealth was required to show that Appellant (1) made a threat of physical force (2) either explicitly or implicitly (3) that created fear (4) of immediate death or physical injury (5) to the victim or another person.

The facts of the present case show the Appellant threatened to reveal the victim's relationship with her older boyfriend to her mother and that as a result of telling her mother the victim's boyfriend would go to jail and "get hurt." It is debatable

7. At trial, Appellant's counsel opposed instructions on lesser-included offenses of first-degree rape, including third-degree rape, arguing that they were not included in the indictment and that there was no proof of such "voluntary" consent or willingness. The Commonwealth had tendered instructions including these lesser-included offenses. The trial court noted that the victim's saying "yes" to sex with the Appellant was the epitome of "consent," presumably in the sense of her having been a willing participant. Nevertheless, the trial court did not include third-degree rape as a possible lesser-included offense.

As discussed above, the trial judge was correct about the victim's willing participation. But that has no bearing on third-degree rape, which can be shown simply by the ages of the parties involved, since being under a certain age can show legal incapacity to consent sufficient to prove the lack-of-consent element of third-degree rape. Defense counsel's claim that these were not proper lesser-included offenses appears to have been driven by a misreading or at least misapplication of *Combs v. Commonwealth*, 198 S.W.3d 574, 580 (Ky.2006), and the incorrect notion that a lesser-included offense cannot be included if it was not in the indictment.

whether Appellant made a threat of physical force at all,[8] but it is not necessary to reach that issue because whatever physical force may have been threatened was insufficiently immediate to satisfy KRS 510.020(2).

The word "immediate" as it is used in KRS 510.010(2) is a modifier of the words "death" and "physical harm." Thus, the victim's fear in this case must have been of a specific kind recognized by the definition of forcible compulsion: a fear of *immediate* death or physical injury. The mere making of a threat of physical force is not enough to satisfy the language of the statute, as the threat must cause a particular kind of fear.

The facts of the present case make clear that a chain of events would have to occur for the Appellant's threat to come to fruition. The Appellant would have to tell Sally's mother about the relationship; Sally's mother would have to decide to call the police; and the boyfriend would have to be taken into custody and exposed to risk. This sequence of events is simply too tenuous and extended over time to be interpreted as *immediate* death or physical harm as required by the statute.

Appellant cites to our decision in *Miller v. Commonwealth*, 77 S.W.3d 566 (Ky. 2002), as instructive in our determination of whether the threat in this case constituted forcible compulsion. In *Miller*, as noted above, we found no evidence of forcible compulsion because there was no testimony by the victim that the defendant used physical force to commit the rape, or that she submitted to sexual intercourse because of threats of physical force. Appellant argues that like the victim in *Miller*, there was no testimony that Sally had sex with Appellant because of a threat of the kind mentioned in the statute—fear of *immediate* death, physical injury or kidnapping—and that the victim agreed to have sex with him because of his threat to tell her mother and that threat is not covered by the statute. We must agree. There is no question that Appellant's conduct was intentionally coercive and reprehensible—it just does not meet the statutory elements of first-degree rape.

The Commonwealth attempts to distinguish *Miller* by noting that the victim's testimony in this case points to the fact she believed that her boyfriend was in imminent danger of physical harm. The Commonwealth points to the facts that the victim gave in to Appellant's advances the

---

8. The Court recognizes the ultimate result suggested by Appellant when he made the threat was that Austin would suffer physical injury at the hands of a future, unknown inmate. On the other hand, the threat itself was merely that Appellant would tell Sally's mother about her relationship. The victim testified that Appellant did not directly threaten to physically harm her boyfriend, and rather that he had only threatened to put the boyfriend in jail and that "people in jail" would hurt him. There was no testimony that Appellant knew anyone in jail whom he could direct to hurt the victim's boyfriend. Thus, at best, the facts of this case evidence the victim believed her boyfriend might get hurt by some unidentified person in the future. It is not necessary to decide today whether the impli-

cation of such harm is a sufficient threat to create forcible compulsion under different circumstances.

This is not to say or imply an accused must always be the direct cause of harm to the victim. It is conceivable that in some factual scenarios the actual perpetrator of the rape could exert a degree of control over another person so as to make a threat of physical force to be carried out by that person sufficient to rise to the level of forcible compulsion. However, in this case, even if we were to assume that the Appellant's threat was one of physical force, it certainly was not sufficiently immediate to satisfy the language of the statute, and thus we need not resolve whether the Appellant's threat was one of physical force.

same night they were made, that the victim had resisted sexual advances from Appellant in the past, and that she only agreed to have sex with Appellant after she perceived someone she cared for was in danger as proof the victim believed the Appellant's threat.

However, the victim testified that she did not believe Appellant would physically harm her boyfriend. The threat the victim feared was that her mother would be made aware of the relationship and that as a result of that her boyfriend could go to jail and be hurt. The real fear was the threat that Appellant would tell her mother about the relationship. Not that she feared immediate death or physical injury.

■ In reaching our decision, we acknowledge the long-standing precedent that "[i]n determining whether the victim submitted because of an implied threat which placed her in fear, a subjective rather than an objective standard must be applied." *Yarnell v. Commonwealth*, 833 S.W.2d 834, 836 (Ky.1992) (citing *Salsman v. Commonwealth*, 565 S.W.2d 638 (Ky. App.1978)). That standard, however, does not obviate the requirement that the fear the victim experiences must fit within that recognized by the statute. Appellant testified that the only physical force she feared as a result of Appellant's threat was that Austin would be injured once he went to jail. Not only was there no guarantee that any of the chain of events following the Appellant disclosing Sally's relationship would actually occur, there is simply no evidence that she believed they would occur in the immediate future.

The ambiguity in this area of the law results from the Court's failure to adhere to the strict language of the statute. In *Yarnell*, the defendant was convicted of the first-degree rape and sodomy of his stepchildren. In summarizing the evidence of forcible compulsion, this Court cited the children's testimony that they were afraid of the defendant and that he was often yelling and screaming, and punished them by making them perform oral sex on him. *Id.* at 836. There was also testimony that the defendant had on several occasions hit and thrown one of the children against a wall. *Id.* at 837. The children also testified to committing the sex acts because they feared the loss of family financial security, for the unhappiness of their mother, and to keep their mother from going to jail. *Id.* at 836–37. The Court summarized the evidence of forcible compulsion as:

> The evidence indicates that the two children were subject to constant emotional, verbal and physical duress. They lived in continued fear of what Yarnell might do to them or their mother. They testified that they went along with the deviate sexual behavior only because of this fear. Under the evidence as a whole, it was not clearly unreasonable for the jury to find that Yarnell engaged in sexual intercourse with the children by means of forcible compulsion.

*Id.* at 837.

Our decision in *Yarnell* drifted astray from the language of the statute and created confusion about what types of threats are sufficient to satisfy the definition of forcible compulsion. Regardless, when this Court examines the facts of *Yarnell* according to the language of the statute, there is little doubt that the result of that case was correct. The children testified to a constant fear of physical abuse. This constant fear translates to a continual fear of immediate physical injury. The children clearly perceived they could be hurt at any time by the defendant so they went along with his sexual demands.

But this case is distinguishable from *Yarnell* because the fear of physical injury

to the victim's boyfriend was too attenuated and not immediate. The victims in *Yarnell* feared immediate retribution at the hands of the defendant based on a long pattern of behavior and family dynamic. Here, however, by Sally's own admission, whatever harm might come to Austin would not be immediate, coming instead at some unspecified and unknowable time in the future.

The Commonwealth's argument that the consequences of the threat were immediate is misguided. The Commonwealth argues that Sally subjectively believed that Appellant would immediately tell Sally's mother about her relationship with Austin because of previous history between Appellant and Sally where he had propositioned her before. We do not doubt that Sally thought that Appellant would immediately relay this information to Sally's mother; but, as noted above, the statute requires that the Commonwealth prove the immediacy of death or physical harm. There is simply a difference between an immediate threat (which is what the Commonwealth suggests the statute covers) and threat of something immediate (which is what it actually covers). The word "immediate" does not modify the word "threat" in the statute, nor does it modify the word "fear"; rather, it modifies the words "death" and "physical injury," which the victim must fear, which, in turn, the threat must cause.

The heinous factual circumstances often present in these types of cases make them especially difficult. But as with any criminal offense, the burden remains on the Commonwealth to prove each element of the offense as that offense has been defined by the legislature. However deplorable a defendant's actions are, his inalienable constitutional rights have been violated when this does not occur. In this case, Appellant could not have been convicted of first-degree rape by forcible compulsion under the "threat of physical force" prong of the definition, and the trial court committed palpable error in denying his motion for a directed verdict.

### 4. The Appellant's Conviction for First–Degree Rape

Because the Commonwealth did not prove the forcible-compulsion element, Appellant's conviction for first-degree rape cannot stand and must be reversed. This means that he may be retried for any lesser-included offenses that were included in the instructions at trial. The trial court, however, only instructed on the lesser offense of unlawful transaction with a minor, not third-degree rape. For that reason, if Appellant is retried, he cannot be convicted of third-degree rape. *See Combs v. Commonwealth,* 198 S.W.3d 574, 579 (Ky. 2006) ("[T]he trial court's failure to instruct the jury on ... a lesser included offense precludes charging Appellant with that offense as the primary offense at retrial."). To try the Appellant for such an offense would violate "the proscription against double jeopardy," *id.,* and KRS 505.040, which states in relevant part:

> Although a prosecution is for a violation of a different statutory provision from a former prosecution, it is barred by the former prosecution under the following circumstances:
>
> (1) ... a determination that there was insufficient evidence to warrant a conviction, and the subsequent prosecution is for:
>
>> (a) An offense of which the defendant could have been convicted at the first prosecution. ...

KRS 505.040.

Aside from third-degree rape or unlawful transaction with a minor, it would appear that Appellant's crime could consist of an act of sexual blackmail or extortion.

At present, however, our state statutes include no crime denominated "sexual blackmail" or anything similar. Such conduct, consisting of a defendant using fraud or blackmail to get a victim to succumb to sexual contact either through fraud or blackmail, is not included in the rape statutes because lack of consent can only be proven in a few ways (e.g., forcible compulsion or incapacity to consent).

Some blackmail-type threats resulting in sexual contact could be prosecuted as criminal coercion under KRS 509.080,[9] but not all could be recognized as such. The Model Penal Code recognizes the crime of "gross sexual imposition" as an offense providing for the criminality of conduct like that committed by Appellant. *See* Model Penal Code § 213.1(2) (1962).[10] But when our Penal Code was adopted, and many provisions of the Model Code were used, this section was not included.

### B. Computer Password

Appellant also challenges the trial court's admission of his computer password into evidence. Pursuant to a search warrant, local law enforcement entered Appellant's home and seized several computers. Appellant informed law enforcement that he wanted to remove the passwords from his computers so they would be easier to access. Law enforcement would not allow Appellant to access his computers after they had been seized, and instead asked him to disclose the password. At trial, Officer Burnett of the Hickman Police Department testified that Appellant said he did not want to say the password in front of his wife. Instead, he voluntarily wrote down the password on a business card. When he handed the business card back, Appellant stated, "It's not what it seems like." The password written on the business card was "Tori is tight."

Prior to trial, Appellant filed a motion in limine to exclude any reference to the password at trial. The motion was over-

9. KRS 509.080 states:
(1) A person is guilty of criminal coercion when with intent to compel another person to engage in or refrain from conduct, he unlawfully threatens to:
(a) Commit any crime; or
(b) Accuse anyone of a crime; or
(c) Expose any secret tending to subject any person to hatred, contempt or ridicule or to impair another's credit or business repute; or
(d) Take or withhold action as an official or cause an official to take or withhold action.
(2) A defendant may prove in exculpation of criminal coercion committed under subsection (*l*)(b), (c) or (d) that he believed the accusation or secret to be true or the proposed official action justified and that his sole purpose was to compel or induce the victim to desist from misbehavior or to make good a wrong done by him.
(3) Criminal coercion is a Class A misdemeanor.

10. Model Penal Code § 213.1(2) describes the crime as follows:

**Gross Sexual Imposition.** A male who has sexual intercourse with a female not his wife commits a felony of the third degree if:
(a) he compels her to submit by any threat that would prevent resistance by a woman of ordinary resolution; or
(b) he knows that she suffers from a mental disease or defect which renders her incapable of appraising the nature other conduct; or
(c) he knows that she is unaware that a sexual act is being committed upon her or that she submits because she mistakenly supposes that he is her husband.
The manner in which this model offense is defined is in some ways antiquated, but the American Law Institute has formed a Members Consultative Group, the purpose of which is to re-examine and modernize the sexual assault provisions of the Code. *See* Amer. Law Inst., *Current Projects: Model Penal Code: Sexual Assault and Related Offenses,* http://www.ali.org/index.cfm?fuseaction=projects.proj_ip&projectid=26 (last visited Jan. 21, 2014).

ruled, and the business card was produced at trial and entered into evidence.

"It is a well-settled principle of Kentucky law that a trial court ruling with respect to the admission of evidence will not be reversed absent an abuse of discretion." *Commonwealth v. King,* 950 S.W.2d 807, 809 (Ky.1997) (citing *Simpson v. Commonwealth,* 889 S.W.2d 781 (Ky.1994)). "A trial court abuses its discretion when it renders a decision which is arbitrary, unreasonable, unfair or unsupported by legal principles." *Williams v. Commonwealth,* 229 S.W.3d 49, 51 (Ky.2007) (citing *Edmonds v. Commonwealth,* 189 S.W.3d 558, 570 (Ky.2006)). On appeal, Appellant argues the trial court abused its discretion in admitting evidence of the password because it was not relevant, KRE 401, and its prejudicial effect substantially outweighed its probativeness, KRE 403, and thus admission of the evidence was unreasonable, unfair, and legally unsound.

Kentucky Rules of Evidence 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." KRE 401. Moreover, "[t]o show that evidence is relevant, only a slight increase in probability must be shown." *Blair v. Commonwealth,* 144 S.W.3d 801, 808 (Ky.2004) (citing *Springer v. Commonwealth,* 998 S.W.2d 439, 449 (Ky.1999)).

However, a relevant piece of evidence may be excluded if its probative value is substantially outweighed by undue prejudice, confusion of the issues, misleading the jury, undue delay, or presentation of cumulative evidence. KRE 403. A proper balancing under KRE 403 requires that a trial court consider three factors: the probative worth of the evidence, the probability that the evidence will cause undue prejudice, and whether the harmful effects substantially outweigh the probative worth. *Barnett v. Commonwealth,* 979 S.W.2d 98, 100 (Ky.1998). Thus, if the possibility of undue prejudice outweighs the probative worth of the evidence presented, it should be excluded.

An appellate court evaluating a trial court's balancing under KRE 403, must consider the evidence in the light most favorable to its proponent, giving the evidence its maximum reasonable probative force and its minimum prejudicial value. *Major v. Commonwealth,* 177 S.W.3d 700, 707 (Ky.2005). In the present case, the trial court did not abuse its discretion in admitting Appellant's password into evidence.

Appellant's password was relevant and had an extremely high probative value. First, the password contained the frequent nickname of the victim ("Tori") and described a physical sensation commonly associated with sexual intercourse in language commonly used to describe the sensation ("is tight"). Second, the Appellant's unwillingness to disclose the password in front of his wife and his statement that the password was "not what it seems like" show his knowledge of the significance of the words used in the password and that they were not innocent. These facts are clearly of consequence and make an incident of sexual intercourse between the victim and Appellant more probable.

As this Court has noted, "KRE 403 ... does not offer protection against evidence that is merely prejudicial in the sense that it is detrimental to a party's case." *Webb v. Commonwealth,* 387 S.W.3d 319, 326 (Ky.2012). Appellant cites to several unpublished cases as persuasive to our determination of undue prejudice. We find, however, the presented cases are easily

distinguishable,[11] as none of them present a scenario where the piece of contested evidence describes both the precise victim and nature of the crime involved at issue.

Thus, the probativeness of the evidence was not outweighed, substantially or otherwise, by other considerations like undue prejudice. Thus, the trial court did not abuse its discretion in admitting this proof.

## C. Questioning About Prior Inconsistent Statement

▇▇▇ Appellant also asserts that the trial court abused its discretion when it declined to allow Appellant to ask Sally about a prior inconsistent statement she allegedly made to a care provider at a counseling center.

Prior to trial, Appellant made a motion to gain access to records concerning Sally's treatment at Lincoln Trails, a counseling center. The Commonwealth objected to Appellant's motion, citing the psychotherapist-patient privilege and arguing that he had failed to produce sufficient evidence to entitle him to an *in camera* inspection of the records or to any abrogation of the privilege. The records were eventually obtained by court order on the basis of a letter written by Sally to her mother. The records were reviewed *in camera* by the trial court judge, and at least some of them were turned over to the defense. The records were not included in the appellate record, but based on statements made by the judge and lawyers at bench conferences and the like, some of their contents are known.

A review of those portions of the video record indicates that the therapy records showed that on December 28, 2010, an unknown person with the initials "J.H." noted in Sally's file that she denied Appellant had been sexually inappropriate with her and that she denied any sexual improprieties by Appellant. The Commonwealth and Appellant's counsel each filed motions *in limine* concerning admission of the records at trial.

The Commonwealth's motion argued that the statements should not be admitted because J.H., the alleged author of the notes, was not present to testify. Additionally, the Commonwealth argued the records and thereby the statements contained in those records were privileged and should not be admitted. By contrast, Appellant's counsel argued that though the records may be privileged, Appellant's constitutional right to confront witnesses trumped the witness's statutory "psychotherapist-patient" privilege.

On the day of trial, the parties discussed their respective motions in chambers. Regarding the statement in Sally's records, Appellant's counsel stated that she wished to ask Sally if she had told anyone at Lincoln Trails about the sexual assault and, if Sally answered in the affirmative, to present the record to her. Before making his ruling, the trial court expressed concern that the identity of J.H. was unknown to either party. The court then reexamined the records. In this examination of the records, the judge stated that initials J.H. appeared on some of the documents. He also stated that the name "J. Hall"

11. Appellant first cites *Williams v. Commonwealth*, 2008–SC–000138–MR, 2010 WL 2025099 (Ky. May 20, 2010), a rape and sodomy case, in which we found the defendant's Myspace username and password of "Demon Man" and "666.69", respectively, as irrelevant and prejudicial. Second, Appellant cites to *Thompson v. Commonwealth* 2003–SC– 0252–MR, 2004 WL 2624165 (Ky.2004), a rape case in which we found admission of a defendant's "Hammadick" tattoo had no relevance and was harmless—noting that neither the Commonwealth nor the defense had shown any explanation of the meaning of the tattoo.

appeared on some of the documents. He also stated the initials "LPCC" appeared in connection with the initials or the name and speculated that they meant licensed clinical counselor or something similar. "LPCC" appears to refer to a licensed professional clinical counselor as discussed in KRE 506. Ultimately, the trial court ruled that the statements could not be admitted unless Sally opened the door by making a statement that would permit their introduction (such as by referring to statements, made or not, at the treatment center). The court did not state a basis for this decision. At trial, Sally stated that she only told her mother and friend about the rape, and did not mention any statements made at Lincoln Trails. Thus, the jury heard nothing about Sally's prior inconsistent statements.

On appeal, each brief focuses on whether the statements would be admissible as prior inconsistent statements under KRE 801(A)(a)(*l*).[12] Under that rule, when certain conditions are met, hearsay may be admitted for both impeachment and substantive purposes. This claim, however, is difficult to evaluate because it is not clear from the record whether the trial court's ruling was based on the inability to locate J.H. to testify or the privileged nature of the statements, or some combination of the two. If the records or statements were indeed privileged, then a mere hearsay exception, even if met, would not trump it.

In its brief to this Court, the Commonwealth mentions the privilege discussion that happened at the trial court but does not argue directly the applicability of the privilege at this stage. And, even if it were making that argument, a privilege has not been shown to be applicable.

First, the record as it stands simply does not prove the applicability of the privilege. As we noted previously, the documents in question were never introduced into the record. Likewise, neither party identified J.H., so the exact position of J.H. and his or her relationship with Sally is unknown.[13] It is impossible for this Court to adequately address the issue where the record was not fully-developed at the trial level and not provided for review to this Court.

Given this confusion, this Court cannot conclude that there actually was a privilege. "[T]he party asserting a privilege must prove its applicability." *Haney v. Yates,* 40 S.W.3d 352, 355 (Ky. 2000); *Sisters of Charity Health Systems, Inc. v. Raikes,* 984 S.W.2d 464, 469 (Ky. 1998) ("[T]he burden of proving that a privilege applies rests on the party claiming its benefit."). This stems from "the nearly universal rule that privileges should be strictly construed, because they contravene the fundamental principle that 'the public ... has a right to every man's evidence.'" *Raikes,* 984 S.W.2d at 468

---

**12.** That rule states:

Prior statements of witnesses. A statement is not excluded by the hearsay rule, even though the declarant is available as a witness, if the declarant testifies at the trial or hearing and is examined concerning the statement, with a foundation laid as required by KRE 613, and the statement is ... [i]nconsistent with the declarant's testimony....

**13.** The nature of J.H.'s position and relationship with Sally is important because it would

dictate which privilege actually applies. It is highly unlikely that J.H. was an attorney or clergy, given the context of the relationship, and instead J.H. was likely some sort of mental health professional. But even then, there are two different mental health professional privileges, one for the counselor-client relationship, KRE 506, and one for the psychotherapist-patient privilege, KRE 507. The two privileges operate differently and are mutually exclusive.

(quoting *Trammel v. United States*, 445 U.S. 40, 45, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980)). The Commonwealth failed to develop a sufficient record demonstrating its applicability.

Second, and more importantly, it appears that the trial court waived or pierced the privilege under the auspices of *Commonwealth v. Barroso*, 122 S.W.3d 554, 563 (Ky.2003), by turning the records over to the defense. After the *in camera* review of the records, the trial court indicated that several exculpatory statements had been found and offered to make those parts of the records available to the defense. At that time, defense counsel noted she wanted to use the exculpatory statements as impeachment, and the Commonwealth objected by arguing that the privilege applied. But by finding that the material was exculpatory and making it available to the defense, the trial court had already decided that the Appellant's due-process right to make a defense trumped the privilege under *Barroso*. The Commonwealth could not then properly argue that the privilege still applied to those parts of the records, and the admissibility of the statements turned not on whether they were privileged but whether the other rules of evidence allowed their admission.

As noted above, the Appellant argues that the statements were admissible under KRE 801A(a)(1), which is in part a codification of the so-called Jett Doctrine. That rule has four requirements: (1) a testifying witness who made out-of-court statements; (2) an inconsistency between the witness's testimony at trial and the out-of-court statements; (3) a foundation that complies with requirements of KRE 613; and (4) an examination concerning the statements. Robert G. Lawson, *The Kentucky Evidence Law Handbook*, § 8.10[2] at 573 (4th. ed.2003).

There is little question that the statement at issue was inconsistent with Sally's trial testimony. Moreover, Sally testified in court, and defense counsel proposed to examine her concerning the statements. But it appears that there may have been an insufficient foundation for admitting the records themselves in which the statements appeared.

Again, it is unclear whether the trial court denied Appellant's motion based on privilege grounds or a failure to prove the applicability of a hearsay exception under KRE 801A(1)(a). Given that the trial court would not allow Appellant's counsel to ask Sally whether she had ever told anyone at Lincoln Trails that Appellant had never been sexually inappropriate with her unless she *"opened the door"* to such questioning, it is possible that there was not a proper foundation laid under KRE 613 to admit the report.

There were two "layers" of hearsay in Sally's records, each requiring its own hearsay exception. First, there were Sally's statements to "J.H." contained in the records. As noted above, these statements would squarely fall under KRE 801A(1)(a) because Sally was testifying about inconsistent statements about which a proper foundation was laid and such statements were examined in court.

The second hearsay layer was the record itself, which was prepared by J.H. While the report could have fallen under the "business records" exception in KRE 803(6), *see Matthews v. Commonwealth*, 163 S.W.3d 11, 27 (Ky.2005), such records must still be authenticated. Indeed, KRE 803(6) specifically requires that testimony of the "custodian or other qualified witness" to be present in court to lay a foundation or the records must be self-authenticating under KRE 902(11) or KRS 422.300. Appellant failed to call the custodian of records at Lincoln Trails nor did he

locate and subpoena "J.H." And nothing suggests that the records were properly certified so as to make them self-authenticating. This Court does not have the records themselves to see whether they were so certified, and nothing was said on the trial record about such a certification. The trial court only allowed Appellant's counsel to question Sally about them if Sally opened the door to such questioning, possibly because Appellant would not be entitled to rebut her testimony with extrinsic evidence, namely her Lincoln Trails report, if they were not properly authenticated. Absent calling J.H. or the custodian of records, or having self-authenticating records, Sally's records were inadmissible hearsay evidence and the trial court would not be in error in denying Appellant's motion to the extent that he sought to admit the medical records themselves.

 But the Appellant argues that the trial court erred at the first level of hearsay analysis by not allowing defense counsel to even question Sally about the statements, specifically to ask whether she had denied the sexual assault to anyone while in treatment, regardless of whether the records themselves were admissible. There is no question, as noted above, that the statements Sally allegedly made were inconsistent with (and in fact contradicted) her trial testimony, and thus were exculpatory. Cross-examination is wide-open in Kentucky, and thus "[a] witness may be cross-examined on any matter relevant to any issue in the case, including credibility." KRE 611(b). Admittedly, we have held that "trial courts retain broad discretion to regulate cross-examination." *Bratcher v. Commonwealth*, 151 S.W.3d 332, 342 (Ky. 2004) (quoting *Commonwealth v. Maddox*, 955 S.W.2d 718, 721 (Ky.1997)) (alteration undone). But "the judge enjoys power and discretion to set appropriate boundaries" on cross-examination only when the defendant is allowed to develop "a reasonably complete picture of the witness'[s] veracity, bias and motivation." *Id.* This right to cross-examine is all the more important in a criminal trial, where the defendant has the constitutional right to cross-examine witnesses against him, and when the cross-examination would elicit exculpatory testimony.

The Appellant had more than a substantial basis to ask Sally the proposed questions. Even if the records were not ready for admission themselves, the trial court had obtained them from the treatment facility and had reviewed them. They thus had at least some indicia of reliability, and certainly enough to allow defense counsel to ask about them.

And the fact that defense counsel may not have stood ready to admit the records themselves is no basis for limiting cross-examination of Sally. Indeed, this may have been the rationale behind the trial court's limitation on cross-examining Sally. But the records would have been necessary only if Sally denied having made the exculpatory statements to a therapist. And this Court will not presume that a witness will lie on the stand and thus allow cross-examination only if the defense can show an ability to impeach before even asking the question. The oath or affirmation required of every witness is specifically intended "to awaken the witness'[s] conscience and impress the witness'[s] mind with the duty to [testify truthfully]." KRE 603. The very truth-seeking function of the court system depends on the effectiveness of that oath.

 For these reasons, it was an abuse of discretion for the trial court to bar defense counsel from even asking Sally if she had made the exculpatory statements while in treatment. Additionally, this Court concludes that this error was not harmless. An error will not be harm-

less and will thus require reversal when a court cannot "say with fair assurance that the judgment was not substantially swayed by the error." *Winstead v. Commonwealth,* 283 S.W.3d 678, 688–89 (Ky.2009) (citing *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). "The inquiry is not simply 'whether there was enough [evidence] to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.'" *Id.* at 689 (quoting *Kotteakos,* 328 U.S. at 765, 66 S.Ct. 1239, alteration in original).

Because the questioning presumably would have elicited substantially exculpatory testimony, this Court is left with grave doubt that the jury's verdict was not swayed. For that reason, the error was prejudicial and requires reversal of the Appellant's remaining conviction.

### III. Conclusion

The Appellant's conviction for first-degree rape is reversed due to insufficient evidence of "forcible compulsion," a necessary element of that offense, and remanded for further action on any instructed lesser-included offenses. Although, the trial court properly admitted Appellant's computer password into evidence, the trial court abused its discretion and committed reversible error when it did not allow Appellant to ask Sally about her prior inconsistent statement. Thus, his conviction for first-degree sexual abuse must also be reversed. For the foregoing reasons, we reverse the judgment of the Fulton Circuit Court and remand for further proceedings that may be necessary, consistent with this Opinion.

All sitting. MINTON, C.J.; ABRAMSON, KELLER, SCOTT and VENTERS, JJ., concur.

CUNNINGHAM, J., concurs in result only by separate opinion.

CUNNINGHAM, J., Concurring in Result Only.

I respectfully submit that the rules of evidence, and more especially KRE 613 and 801(A)(a)(1), do not allow for the purpose of impeachment a written statement made by an unknown person. This pertains to the written statement attempted to be introduced by the defense which related that the victim Sally asserted that the Appellant never assaulted her. We only know that a person with the initials J.H. presumably received the alleged statement. It is a highly prejudicial statement and without knowing the identity of J.H., the Commonwealth is precluded from attacking the credibility of J.H. For all we know, the person could be a friend, neighbor, or even relative of the Appellant with a bias and motive to fabricate. I do not believe the trial court abused its discretion in ruling the statement of J.H. would not be admitted. I fear our ruling on this critical evidentiary matter will lead to much harm. Therefore, I respectfully concur in result only.