RENDERED: NOVEMBER 4, 2022; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2020-CA-1101-MR

JEFFREY DOUGOUD                                                    APPELLANT

|   |   |
|---|---|
| v. | APPEAL FROM CAMPBELL CIRCUIT COURT<br>HONORABLE JULIE REINHARDT WARD, JUDGE<br>ACTION NO. 19-CR-00141 |

COMMONWEALTH OF KENTUCKY                                APPELLEE

### OPINION
### AFFIRMING

** ** ** ** **

BEFORE: DIXON, McNEILL, AND K. THOMPSON, JUDGES.

THOMPSON, K., JUDGE: Jeffrey Dougoud appeals from his convictions on two counts of sexual abuse in the first degree and sentencing for those convictions by the Campbell Circuit Court following a jury trial. We affirm as the circuit court properly denied: (1) Dougoud's motions for a directed verdict as there was sufficient evidence to establish the two counts of sexual abuse based on sexual

contact by forcible compulsion; (2) Dougoud's motion to review victim's psychotherapy records as Dougoud failed to make the preliminary showing needed to access them; (3) Dougoud's motion for a mistrial as mother's statement that he had killed before in the line of duty was appropriately addressed through an admonition. We also reject Dougoud's argument that cumulative error based on improper character evidence requires reversal as the circuit court properly addressed the objections that Dougoud made.

## FACTUAL AND LEGAL BACKGROUND

Assuming the truth of the evidence in favor of the Commonwealth, and drawing all fair and reasonable inferences from it, the facts are as follows. The victim in this case was C.T. (victim). Victim's mother and stepfather[1] had a home outside of Alexandria, Kentucky. They had four sons – two each from previous marriages – who lived there at least some of the time. Victim, who was born in 2001, was the oldest and he lived primarily in that home.

Stepfather had been friends with Dougoud for most of his life. Mother had met Dougoud before, but they became friends only after he started visiting the house regularly in 2015 to socialize with the family. Dougoud was openly gay, and stepfather and mother accepted his sexuality.

---

[1] To protect victim's privacy, we do not refer to mother and stepfather by name. Mother and stepfather previously cohabitated and then married after the incidents at issue but before the trial; to avoid confusion, we consistently refer to mother's paramour and then husband as stepfather.

According to stepfather and mother, Dougoud usually carried a Kimber .380 handgun, holstered to his hip. Stepfather also owned and carried firearms. Stepfather, Dougoud, and sometimes the boys, would step out to stepfather's backyard range to shoot. Victim testified that, on occasions prior to the events of this case, Dougoud showed him the Kimber he usually carried and allowed him to fire it at the backyard range; that Dougoud often spoke about being a military veteran; and that Dougoud had frequently described himself as a "well-received and important" and "well-qualified" member of the armed forces, "some form of sniper," and that he "had killed during his service."

Victim considered himself to have had a great relationship with Dougoud prior to the events of this case, and he thought of Dougoud as the equivalent of his "uncle." He also liked Dougoud's pickup truck.

On September 21, 2016, when victim was 15 years old, Dougoud picked victim up from his home under the pretense of giving him practice driving the truck. Mother photographed victim in the driver's seat before the two of them departed and posted the photograph to her social media account. She testified her understanding was that victim and Dougoud were going to practice driving in the parking lot of a local elementary school.

Thereafter, Dougoud and victim alternated driving backroads in Campbell County. They stopped at victim's house briefly; then victim drove to a

convenience store five minutes away where they purchased drinks. Afterward, Dougoud took over driving, initially heading back toward victim's house, and victim believed they were returning to his home until Dougoud passed his street and began traveling roads unfamiliar to victim.

Victim testified that during the drive his conversation with Dougoud started out "normal," but that as Dougoud continued driving, he gradually steered it toward sexual topics. He questioned victim about his workout routine. He asked victim about his abdominal muscles and told victim to show them to him. Victim thought Dougoud's request was "weird," but raised his shirt. Dougoud "poked" his abdominal muscles and said that victim was "doing alright."

Next, according to victim, Dougoud asked about the appearance of victim's pubic hairline, and whether victim trimmed it. Victim testified that at that point, he was scared. No one had ever asked to see his pubic hairline; he believed the request was odd; and he told Dougoud, "that's kind of weird. I don't really want to do that." Dougoud responded, "No, it's okay. You should really just show me." When victim refused again, Dougoud said, forcefully, "No. Show me."

Victim testified, "at that point, I felt like I had to, or something was going to happen that I didn't want to happen." Victim hooked his thumb inside the waistband of his pants "and just kind of pushed downward, and you could see the line, but nothing more. And after that, I pulled my pants back up as fast as I could,

and just kind of sat there." Victim testified Dougoud told him his pubic line

"wasn't that bad," and that he'd "seen worse," which made victim feel awkward.

After the two discussed other topics, Dougoud then asked victim

whether he had ever had sex or anything like it. Victim answered that he and his

girlfriend had engaged in sexual activity but had not had sex. Dougoud asked

victim what he was "working with," and if he was "doing a good enough job."

Victim did not understand. From there, things progressed:

> Victim: And at that point, he was like, "Well, why don't
> you show me what you got? And I was like, "I don't
> think that's good at all. I really don't want to do this."
> And he was like, "No. You should really, you should
> really show me." And, um, at that point I was, I was
> really scared. I mean, you hear of this stuff happening to
> other people, but, uh, I didn't think it was going to be me.
> And, um, he was like, "You should really just, just show
> it to me." Um, I said okay. I felt like I had to. I didn't
> see any other option, it was in a moving car. So I did
> what he had told me to do, and took my penis out.

> Victim testified Dougoud then "complimented" him on his penis.

Victim testified he felt uncomfortable and did not want to be in the truck with

Dougoud. He further testified:

> Victim: At that point, he was getting ready to make a
> turn in the road. As all of this was happening, he was
> still driving. And, at that point, when he looked away, I
> pulled my pants up as fast as I could. And he looked
> back over and said, "No. Pull that back out." And I was
> like, "Uh, I don't really think so." And he was like, "No,
> it's okay. You should do that." And, I did.

Commonwealth:  And why did you do that?

Victim:  Again, that same forceful, assertive commentary, I guess you would say.  The voice he was giving to me, I didn't feel like I had an alternative.  I felt like if I didn't, then something was going to happen to me, and I couldn't get away because I was in a truck, moving.  I couldn't just jump out.  So I did what he asked again.  And at that point, he asked me to touch myself, um, masturbate, and I did as he agreed, er, I did what he had asked, I agreed.  I did that, and, um, at that point, he, had had, um, taken his own penis out while he was driving.  And, we were right by a church, um, that we were passing, and he had, um.  I looked out the window for a split second.

Commonwealth:  You said the window, which window were you looking out of?

Victim:  The passenger-side window.  And I had looked out the window, um, and he, when I looked back, I heard a sound and it was his belt coming undone.  You know how you can hear a belt, it's metal.  I looked back and he had pulled his pants to about his lower thigh, towards his knees.  And, he had his penis out, and asked me to touch it.  And, I was like, "that's a little much.  I don't, I don't think I want to do that at all."  And, he had said, "Naw, it's okay.  You should do that."  I was like, "No, I really don't want to."  He was like, "No.  Do it.  Touch it."  As, overall, I was just scared.  Um, and then he said it again, he had, almost like a, not quite a snap, but like a break of just like, "No!  Do it!"  Um, I said "okay."  Um, I just, I just touched it, and then backed off, just quick.  Just placed and then removed.

Victim then testified about the incident that formed the basis for the

first sexual abuse charge:

Victim: . . . And then at that point he had grabbed my hand and placed it around it [Dougoud's penis] in a, like this. Like a, what would, a circular motion with my hand.

Commonwealth: So, you're saying he placed his hand onto, over your hand?

Victim: Yes. Over my hand. Like this, and then wrapped around his penis, and made me perform a masturbatory motion.

Commonwealth: And when you said he "made you," how did he make you?

Victim: Um, my, his hand was around mine, and kind of did it himself, but my hand was there and in between. And, um, he had made me do that for a while, and then he had to make a turn, not like a full turn, but a veer, with both hands, and I removed my hand as soon as he took it off.

Victim testified that shortly after he had removed his hand from Dougoud's penis, Dougoud drove them to a wooded section of an isolated road and parked. Victim started to pull his pants up, and Dougoud told, rather than asked, victim to pull them back down. Victim complied. Dougoud opened the center armrest and removed a partial roll of paper towels that held a bottle of lubricant in the core. Dougoud used his own hand to apply the lubricant to his own penis.

Victim then testified about the incident that formed the basis for the second sexual abuse charge. Dougoud then rubbed lubricant onto victim's penis. Victim did not resist. Victim testified that while this was happening:

> Victim: I was just overall scared and anxious, not only because of, I was worried about what was happening, but also what would happen if I did try to escape? Or, or just say anything about it, ever? And that was already going through my head when it was happening.

Victim testified that immediately after Dougoud rubbed lubricant onto his penis, Dougoud reached down and produced a handgun (what victim recognized as Dougoud's Kimber .380, still in its nylon holster); placed the holstered gun onto the dashboard, barrel pointed toward victim; and said in a stern tone, "I'm just going to get this out of the way." Victim testified this was the first time he had seen the weapon during their ride, that he regarded the action as an intimidation tactic, and that he was in fact intimidated by it.

We will not detail the remainder of the incident between victim and Dougoud in the truck, as what followed formed the basis of the sodomy charge which is not at issue in this appeal.

Before Dougoud ultimately drove victim home, the following exchange took place according to the victim.

> Victim: He said, "Now, you know not to tell anybody about this, right?" And I said, "Yeah. I gathered." And he said, "You know I've killed people before. I'm not afraid to do it again." I just kind of nodded.

After the conclusion of the jury trial, Dougoud was convicted of two counts of sexual abuse in the first degree, one count of sodomy in the third degree,

and was consequently sentenced to three consecutive terms of five years'

imprisonment, for a total of fifteen years.

## ISSUES ON APPEAL

Half of Dougoud's appeal is devoted to what he believes were the

circuit court's errors in denying his directed verdict motions regarding his sexual

abuse charges.  The latter half of his appeal relates to asserted evidentiary errors.

## I. DIRECTED VERDICT ON SEXUAL ABUSE CHARGES

Our standard of review relative to a trial court's denial of a directed

verdict motion is as follows:

> [O]n a motion for directed verdict, the trial court must
> draw all fair and reasonable inferences from the evidence
> in favor of the Commonwealth.  If the evidence is
> sufficient to induce a reasonable juror to believe beyond
> a reasonable doubt that the defendant is guilty, a directed
> verdict should not be given.  For the purposes of ruling
> on the motion, the trial court must assume that the
> evidence for the Commonwealth is true, but reserving to
> the jury questions as to the credibility and weight to be
> given to such testimony.
>
> To defeat a directed verdict motion, the
> Commonwealth must only produce more than a mere
> scintilla of evidence.  On appellate review, the test of a
> directed verdict is, if under the evidence as a whole, it
> would be clearly unreasonable for a jury to find guilt,
> only then the defendant is entitled to a directed verdict of
> acquittal.

*Lynch v. Commonwealth*, 642 S.W.3d 647, 658 (Ky. 2022) (internal citations,

brackets, quotation marks, and footnotes omitted).

The Commonwealth's theory of its case against Dougoud was that he was guilty of two counts of sexual abuse in the first degree because, on two occasions during a truck ride, he subjected victim to sexual contact "by forcible compulsion." Kentucky Revised Statutes (KRS) 510.110(1)(a). In his motion for a directed verdict, Dougoud argued the Commonwealth failed to present sufficient evidence of the "forcible compulsion" element with respect to both counts.

"Forcible compulsion," for purposes of sexual abuse in the first degree, means:

> [P]hysical force *or* threat of physical force, express or implied, which places a person in fear of immediate death, physical injury to self or another person, fear of the immediate kidnap of self or another person, or fear of any offense under this chapter. Physical resistance on the part of the victim shall not be necessary to meet this definition[.]

KRS 510.010(2) (emphasis added).

In other words, there are two types of "forcible compulsion" described in KRS 510.010(2): (1) "physical force" forcible compulsion; and (2) "threat" forcible compulsion. The Commonwealth relied on both types to prove its case against Dougoud, using "physical force" forcible compulsion to secure a conviction as to the first count of sexual abuse and "threat" forcible compulsion to secure a conviction on the second count of sexual abuse.

**A. Did the Commonwealth present sufficient evidence to establish the first count of sexual abuse by "physical force" forcible compulsion?**

As to "physical force" forcible compulsion, the Kentucky Supreme Court explained in *Yates v. Commonwealth*, 430 S.W.3d 883 (Ky. 2014), what was sufficient as follows:

> We have found that a defendant used forcible compulsion to commit sexual abuse by taking the victim's hand, without her consent, and placing it on the area of his pants over his penis. *Gibbs v. Commonwealth*, 208 S.W.3d 848 (Ky. 2006), *overruled on other grounds by Padgett v. Commonwealth*, 312 S.W.3d 336 (Ky. 2010). This is correct because he directly compelled her to touch him.
>
> . . .
>
> While it is true that an act as simple as grabbing someone's hand can amount to lack of consent by forcible compulsion given the right circumstances, not all touching will provide those circumstances. If that were the case, then every sex act between otherwise consenting adults would satisfy the elements of the first-degree rape statute, because there is always physical contact between them. Instead, the phrase "forcible compulsion" requires another factual element, namely, lack of consent by the victim, in the sense of lack of voluntariness or permissiveness. This is dictated by the use of the word "compulsion."

*Id*. at 890 (emphasis added). Stated differently, the definition of "physical force" forcible compulsion, as opposed to "threat" forcible compulsion, requires nothing more than physical contact without permission of the victim. "[T]he evaluation of

physical force is based on a victim's express non-consent, or other involuntariness, to a defendant's act. Thus, it may be in one case that a touch of the hand constitutes forcible compulsion while in another it does not." *Id*. at 891.

Regarding the first count of sexual abuse in the first degree of which Dougoud was convicted, the jury determined:

> A. That in [Campbell] county, on or about September 21, 2016, and before the finding of the Indictment herein;
>
> B. The Defendant engaged in sexual contact with [victim] when the Defendant grabbed [victim's] hand and put it on the Defendant's penis;
>
> AND
>
> C. That the Defendant did so by forcible compulsion.

On appeal, Dougoud argues his "act of placing [victim's] hand on [Dougoud's] penis should not be considered a physical act that compelled or was sufficient to overcome the [victim's] own volition under these facts," further explaining in his brief:

> In this case, according to [victim's] testimony, [victim] had allegedly already acted on several of Mr. Dougoud's propositions, such as [victim] showing Mr. Dougoud his penis and [victim] touching Mr. Dougoud's penis. [Victim] only alleged that Mr. Dougoud urged him to participate. [Victim] did not testify that when Mr. Dougoud placed his hand on his penis, that he hesitated in any way or told Mr. Dougoud to stop. In fact, the only time [victim] claimed he told Mr. Dougoud to stop, Mr. Dougoud complied.

We disagree. Based upon victim's testimony, a reasonable jury could find victim evinced, at the very least, "other involuntariness." *Yates*, 430 S.W.3d at 891. Victim testified that when this offense occurred, he believed he had no means of escaping from Dougoud, as they were traveling in a moving vehicle in an unfamiliar area. He rejected *each* of Dougoud's "propositions" until Dougoud changed them from requests or suggestions to intimidating demands. When victim acquiesced, he attempted to do so minimally: He "pulled [his] pants back up as fast as [he] could" after showing Dougoud his pubic hairline; he "pulled [his] pants up as fast as [he] could" to cover his exposed penis "when [Dougoud] looked away"; and when Dougoud exposed his own penis and asked – then *told* – victim to touch it, victim "just touched it, and then backed off, just quick. Just placed and then removed."

Victim also testified about what Dougoud "made" him do: Dougoud "grabbed" victim's hand and used it as a means of masturbating himself. This was well beyond the scope of anything victim had minimally acquiesced in; and when Dougoud released victim's hand, victim immediately removed his hand from Dougoud's penis. Thus, evidence of record supported that victim had no desire to touch Dougoud's penis and that, but for Dougoud's physical compulsion, victim would not have held and rubbed it.

-13-

As for Dougoud's assertion that "the only time [victim] claimed he told Mr. Dougoud to stop, Mr. Dougoud complied," Dougoud is referring to an incident a short time later on in the truck when, according to victim, Dougoud put his left hand underneath victim's legs, reaching for victim's anus; victim pushed his arm away and jumped high enough to strike his head on the cabin ceiling; and Dougoud snickered and remarked, "I guess you're not into that." Whether Dougoud *subsequently* did not touch victim's anus does not, for directed verdict purposes, somehow negate the evidence that Dougoud forcibly compelled victim to touch Dougoud's penis. Therefore, the circuit court committed no error in denying this facet of Dougoud's directed verdict motion.

### B. Did the Commonwealth present sufficient evidence to establish the second count of sexual abuse by "threat" forcible compulsion?

As to "threat" forcible compulsion as defined in KRS 510.010(2), "the Commonwealth was required to show that Appellant (1) made a threat of physical force (2) either explicitly or implicitly (3) that created fear (4) of immediate death or physical injury (5) to the victim or another person." *Yates*, 430 S.W.3d at 892. "In determining whether the victim felt threatened to engage in sex or feared harm from the attacker, a subjective test is applied." *Newcomb v. Commonwealth*, 410 S.W.3d 63, 79 (Ky. 2013) (citation omitted).

Regarding the second count of sexual abuse in the first degree, the jury determined:

> A. That in [Campbell] county, on or about September 21, 2016, and before the finding of the Indictment herein;
>
> B. The Defendant engaged in sexual contact with [victim] when the Defendant rubbed [victim's] penis;
>
> AND
>
> C. That the Defendant did so by forcible compulsion.

Dougoud argues the Commonwealth failed to present evidence of "threat" forcible compulsion in this instance as set out in *Yates*. In particular, he claims a directed verdict was warranted regarding this second offense because, in relation to it, the Commonwealth failed to adduce evidence that he made *any* threat of physical force.

We disagree with Dougoud's contention that no evidence was produced supporting, at the very least, that he *implicitly* threatened victim with physical force that caused victim to fear immediate death or physical injury. A reasonable jury could infer, based upon the circumstances that preceded Dougoud's rubbing lubricant on victim's penis, that victim honestly believed Dougoud would harm him if he resisted. Victim assumed, prior to this incident, that Dougoud *had* killed in the line of duty; Dougoud had told him so. Victim had no reason to doubt Dougoud was *able* to kill again, as victim knew Dougoud often

-15-

carried a pistol, had witnessed Dougoud's skill in using firearms, and because Dougoud had told victim that Dougoud had received specialized military training. From victim's testimony, it could be inferred that Dougoud's skill with firearms, military experience, and apparent history of killing was, by Dougoud's design, a constant undercurrent throughout this incident and a standing, implicit threat of harm that commanded victim's obedience.

In the moments before this second offense, Dougoud had become an unpredictable stranger to victim; his demeanor toward victim had suddenly shifted, for the first time, from that of a trusted family friend, to that of someone willing to demand and, despite victim's reluctance, ultimately compel sexual contact from him. Moreover, Dougoud had taken measures to isolate victim, who did not believe he could escape the situation; and had chosen a secluded location to perform the act, demonstrating he clearly did not wish to be caught.[2] Sufficient evidence supported that victim had a well-founded belief that he would suffer immediate harm if he resisted Dougoud. Accordingly, the circuit court also properly denied this aspect of Dougoud's directed verdict motion.

---

[2] We do not consider victim's testimony about the threats that Dougoud made after he rubbed lubricant on the victim's penis (Dougoud's act of placing the handgun on the dashboard pointing at victim "to get this out of the way" or the warning as Dougoud drove victim home that victim should not tell anyone because Dougoud had "killed people before" and was "not afraid to do it again."). These later threats could not inform victim's fear at the time of this second incident of sexual abuse. However they are consistent with victim having an implicit understanding of what Dougoud could do to victim, should Dougoud chose to do so, which Dougoud confirmed after-the-fact through his threatening action and words.

## II. EVIDENTIARY ISSUES

Dougoud also asserts he is entitled to a new trial because, in his view, the circuit court made several erroneous evidentiary rulings. His arguments are addressed below.

### A. Access to Victim's Psychotherapy Records

On February 2, 2020, the day before trial, Dougoud moved the circuit court to order the production of victim's psychological counseling records, and to conduct an *in camera* review of those records to ascertain whether they contained exculpatory evidence. In his motion, in relevant part, he explained:

> Mr. Dougoud discovered that eight (8) months after this alleged incident, there was a family court hearing regarding [victim] in the Campbell Family Court, 02-CI-1604. The matter revolved around [victim], and his desire to live with his dad. In anticipation of potential impeachment evidence, Mr. Dougoud ordered a certified copy of the hearing and some of the documents filed in regards to the hearing. Mr. Dougoud received said documents from the Campbell County Circuit Clerk on January 28, 2020.
>
> In preparation of trial, on February 1, 2020 Mr. Dougoud discovered, in a Motion for Contempt, that [victim] had been receiving counseling with Viewpoint Psychological Services. This means, eight months **after** the alleged sexual assault, [victim] was working in counseling, with a licensed therapist, and that information was never provided to Mr. Dougoud in discovery.
>
> . . .

Applying the appropriate standard to the above styled case, it is clear that Mr. Dougoud is entitled to an *in camera* review of the psychiatric records of [victim], held by Viewpoint Psychological Services. There is clearly a reasonable belief they contain exculpatory evidence. [Victim] has made statements that he didn't want to live with him [sic] mom because he "feared Dougoud." Yet, while in counseling, it appears this was never disclosed as a basis for why he didn't want to live with his mom. According to [victim's] dad, [victim] was stating his mom kept "a dirty home, engages [him] in adult discussions, and often embarrasses him by being sexually provocative on social media available to friends."

Furthermore, this issue is confirmed by [victim] in his Children's Advocacy Interview that he did not disclose a sexual assault as a basis for his issues in 2017 to his therapist. [Victim] was asked if he had ever told anyone these allegations. He responded he told three girls, in the back of a van, at the Waffle house. He never said he told a therapist. In fact, he never disclosed he had ever received therapy.

The circuit court considered Dougoud's motion on the morning of the first day of trial; and again on February 4, 2020, after Dougoud renewed his motion. Denying it, the circuit court explained that any evidence derived from victim's counseling records for the purposes expressed in Dougoud's motion would be either irrelevant or cumulative. In that vein, the circuit court noted it was unnecessary to search victim's 2017 counseling records to ascertain whether victim had informed his therapist about his sexual encounter with and resulting fear of Dougoud because, as Dougoud noted in his motion, victim had *already* indicated in his CAC interview that, prior to February 2, 2019, he had never informed *any*

-18-

adult of his sexual encounter with and resulting fear of Dougoud. Furthermore, it explained that if victim ultimately testified that his fear of Dougoud had caused him to want to stop living with his mother, Dougoud did not need victim's counseling records for impeachment purposes. Rather, Dougoud could just as effectively resort to the family court's record of victim's custody proceedings, and what it indicated were the other reasons victim had expressed in that separate matter for not wanting to live with his mother.

Dougoud appeals the circuit court's ruling. Upon review, we affirm. The Kentucky Supreme Court recently reviewed the law on this subject, explaining:

> [I]n *Commonwealth v. Barroso*, this Court held that "[i]f the psychotherapy records of a crucial prosecution witness contain evidence probative of the witness's ability to recall, comprehend, and accurately relate the subject matter of the testimony, the defendant's right to compulsory process must prevail over the witness's psychotherapist-patient privilege." 122 S.W.3d 554, 563 (Ky. 2003). The defendant must make a preliminary showing "sufficient to establish a reasonable belief that the records contain exculpatory evidence" before the records are subject to an *in camera* review by the trial court. *Id*. at 564. Exculpatory evidence has been described as "evidence favorable to the accused and material to guilt or punishment, including impeachment evidence." *Id*. Evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

> If the defendant makes this preliminary showing, then "the witness's psychotherapy records are subject to production for an *in camera* inspection to determine whether the records contain exculpatory evidence, including evidence relevant to the witness's credibility." *Barroso*, 122 S.W.3d at 563.

*Smith v. Commonwealth*, 636 S.W.3d 421, 438-39 (Ky. 2021).

Evidentiary rulings are reviewed under the abuse of discretion standard. *Kerr v. Commonwealth*, 400 S.W.3d 250, 261 (Ky. 2013). Here, no abuse occurred.[3] As the circuit court's ruling tends to indicate, Dougoud failed to make the "preliminary showing" that victim's counseling records contained evidence that, within reasonable probability, would have favorably affected the outcome of his trial had they been produced. If the records confirmed that victim had *not* discussed his sexual encounter with and resulting fear of Dougoud, his records would have been cumulative evidence. If the records demonstrated victim *had* discussed those issues with his counselor in 2017, they would have undermined, rather than helped, Dougoud's defense. And, to the extent victim's records had the impeachment value expressed in Dougoud's motion, the circuit court also did not cause Dougoud any undue prejudice by denying him access. The record of victim's custody proceedings – which the circuit court permitted

---

[3] Dougoud also argues that if the circuit court abused its discretion in this regard, it should have also granted his motion to continue his trial for purposes of conducting an *in camera* inspection of victim's counseling records. Considering that the circuit court did not abuse its discretion in this regard, this issue is moot.

Dougoud to utilize at trial – had the same value.  Additionally, during trial, Dougoud ultimately chose *not* to ask victim why victim wanted to move from his mother's house to his father's house.

### B.  Mother's Statement Regarding Dougoud's Comment that he had Killed People in the Line of Duty

As discussed, victim testified that on occasions prior to his incident with Dougoud in the truck, Dougoud had described himself as a "well-received and important" and "well-qualified" member of the armed forces; "some form of sniper"; and that Dougoud had told him he "had killed during his service."  Victim also testified he waited two-and-a-half years to tell an adult about the incident because Dougoud had told him after their encounter not to tell anyone about it, and "You know, I've killed people before.  I'm not afraid to do it again."

On appeal, Dougoud does not contest the relevance or admissibility of that testimony.  However, he asserts the circuit court erred by denying his motion for a mistrial in relation to the following emphasized testimony that another witness, mother, provided during her direct examination by the Commonwealth:

> Commonwealth:  So [Dougoud] told you he was a sniper in the military?
>
> Mother:  Yes.
>
> Commonwealth:  Is that something that people in your family are aware of, your children?
>
> Mother:  Yes.

Commonwealth: And why would they be aware of that?

Mother: He was very proud of it.

Commonwealth: Okay. And, when he talked about being a sniper, um, did he tell you any more detail, or what that entailed?

Mother: *He said that he had killed people while overseas.*

Mother testified before victim testified. Dougoud objected to the emphasized testimony based upon Kentucky Rules of Evidence (KRE) 404, claiming it improperly bolstered what he anticipated victim would later relate about how Dougoud had told victim that Dougoud had killed people in the line of duty while serving overseas. He asserted mother's statement qualified as inadmissible evidence of "other crimes, wrongs, or acts" per subsection (b) of the rule; and that he had not been provided adequate notice of mother's testimony pursuant to KRE 404(c).

The circuit court disagreed with Dougoud's contention that mother's testimony was prejudicial enough to warrant a mistrial. From the bench, it explained that any prejudice arising from the notion that Dougoud may have killed before was limited by the fact that, from all indications, he had only done so within the proper scope of his military service; and that it is commonly understood that military service – particularly military service as a sniper – can require the use of lethal force as an incident of duty. Nevertheless, upon Dougoud's request, the

-22-

circuit court did instruct the jury to disregard mother's testimony about whether he had any occasion to use lethal force while he was in the military.

As indicated, Dougoud now asserts the circuit court erred by denying his motion for a mistrial. We disagree. Our standard for reviewing a trial court's denial of a mistrial request is as follows:

> The decision to declare a mistrial is properly within the sound discretion of the trial court. A mistrial is an extreme remedy and should be resorted to only when there appears in the record a manifest necessity for such an action or an urgent or real necessity. A manifest necessity can be understood as to be an urgent need for a new trial in consideration of the totality of the circumstances. As such, a ruling declaring a mistrial will not be disturbed absent an abuse of discretion by the trial court.

*Hammond v. Commonwealth*, 504 S.W.3d 44, 51 (Ky. 2016) (internal quotation marks and citations omitted).

Here, we agree with the circuit court's assessment that Dougoud's claim that he had killed while fulfilling his military duties is qualitatively different from any claim that he had committed a prior criminal act or other wrong. Apart from that,

> [T]he jury is presumed to follow an admonition to disregard evidence and the admonition thus cures any error. Such presumption can be overcome by a showing either that there is an (1) overwhelming probability that the jury will be unable to follow the court's admonition *and* there is a strong likelihood that the effect of the inadmissible evidence would be devastating to the

-23-

defendant, or (2) the question asked lacks any factual basis and was highly inflammatory.

*Carson v. Commonwealth*, 621 S.W.3d 443, 450 (Ky. 2021) (internal quotation, citations, and footnotes omitted).

Relative to mother's offending testimony, Dougoud does not argue – nor do we find – it was overwhelmingly probable that the jury was unable to follow the circuit court's admonition, or that the Commonwealth's question lacked any factual basis. Therefore, we find no error in this respect.

## C. Cumulative Error Regarding Improper Character Evidence

Dougoud also argues that mother's offending testimony, taken in conjunction with three other purported evidentiary errors roughly following the same theme, amounted to *cumulative* reversible error – a point he did not raise below as a basis for a mistrial.

"[M]ultiple errors, although harmless individually, may be deemed reversible if their cumulative effect is to render the trial fundamentally unfair. We have found cumulative error only where the individual errors were themselves substantial, bordering, at least, on the prejudicial." *Brown v. Commonwealth*, 313 S.W.3d 577, 631 (Ky. 2010) (citation omitted). "If the errors have not individually raised any real question of prejudice, then cumulative error is not implicated." *Elery v. Commonwealth*, 368 S.W.3d 78, 100 (Ky. 2012) (internal quotation marks and citation omitted). "Where . . . none of the errors individually raised any real

-24-

question of prejudice, we have declined to hold that the absence of prejudice plus the absence of prejudice somehow adds up to prejudice." *Brown*, 313 S.W.3d at 631 (citation omitted).

As to the three other purported evidentiary errors, the first two involve statements made by the Commonwealth during its opening and closing arguments. Minutes before the Commonwealth made the statement during its opening arguments which Dougoud found objectionable, the circuit court cautioned the jury that:

> Opening statements are really like a roadmap. It's an opportunity for the attorneys to sort of tell you what they think the evidence is going to be presented to you, but their words, as [the Commonwealth] mentioned in her voir dire of you is not evidence. The attorneys at the end of the case will give you closing arguments. They try to sum up the evidence that they think that you've heard, and what it means, they think, it means to you or to them. But that doesn't mean anything, meaning it's just a roadmap and a closing. You all are ultimately the determinators to find out what the facts are, and what you believe those facts mean, based on the evidence and the law that I'm going to give you.

In its opening argument, the Commonwealth told the jury, "What you discover as you listen to the evidence is that the defendant, Jeffrey Dougoud, was known somewhat as being a badass." Dougoud objected, arguing he had received no notice of "bad acts" evidence pursuant to KRE 404(c), and asked the circuit court to instruct the jury to disregard the Commonwealth's statement. The circuit

court granted his request and instructed: "Ladies and gentlemen of the jury, in terms of the defendant being a 'badass,' I'm going to ask you to strike that from your minds at this point in time." The Commonwealth thereafter proceeded, *without objection*, by stating: "What you're going to hear is that [Dougoud's] former military, they [*i.e.*, his friends] thought he was in special forces, that he carried a weapon all the time, that he could hold his own, so he's not someone you messed around with."

Regarding the objectionable statement in its closing argument, prior to when the Commonwealth made it, the circuit court once again cautioned the jury that the arguments of counsel were not to be considered evidence. Dougoud objected to the emphasized language given in the following context, below:

> So, what you heard from [victim] on the stand, when he described the various acts, the various steps this defendant engaged in, before he forced him to perform on him, before he forced him to do anything in this case, I want you to look back at it, at what he told you. How did he start with it? He talked about sexual experiences. Here's a 49-year-old man, trusted family friend, former military, *has killed before* –

At the ensuing bench conference, Dougoud's counsel explained that whether Dougoud *actually* killed during his military service was never a fact in evidence; victim merely testified at trial that Dougoud *told him* he had done so. The circuit court sustained Dougoud's objection, and the Commonwealth accordingly qualified what it had said, continuing its closing arguments by stating,

*without objection*: "When [victim] told you, that's what he knew about him. That's what he knew about Jeffrey Dougoud, he was a tough guy, he'd been in the military, and he had killed."

With respect to the third purported evidentiary error, it occurred when the Commonwealth played a portion of a controlled call that authorities in the Campbell County Police Department had stepfather make to Dougoud in February 2019, in an effort to have Dougoud incriminate himself. Specifically, while stepfather was speaking to Dougoud at the start of the call, Dougoud stated: "Here I am, this big tough guy, *getting into fights* and drinking, this that and the other." (Emphasis added.)

Dougoud objected. At the ensuing bench conference, he argued that his own statement about "getting into fights" was improper KRE 404(b) evidence. The circuit court sustained his objection. Moreover, it granted the only remedy Dougoud requested, which was a recess to review the remainder of the controlled call tape to ensure it included nothing more about his penchant for fighting.

We disagree that these three purported errors, taken collectively with what has previously been discussed, amounted to cumulative error warranting a mistrial. We begin with the first two. Opening and closing arguments are just that – arguments. *Slaughter v. Commonwealth*, 744 S.W.2d 407, 412 (Ky. 1987). Because opening and closing arguments are not evidence, the prosecutor's

comments during those arguments fall outside the scope of KRE 404(b), which by its plain terms prohibits the use of *evidence* of other crimes, wrongs, or acts to prove a propensity to commit some specific act. Here, the circuit court prefaced both the opening and closing argument segments of the trial by explaining to the jury that arguments of counsel were not evidence, and that they were not to be taken as such.

Regarding the Commonwealth's statement during opening arguments regarding Dougoud being "a badass," the prosecutor explained during her later comments, without objection, that the evidence would reflect Dougoud was formerly in the military; that his friends believed he was in special forces and was a sniper; that he frequently carried a sidearm and was familiar with firearms; that he could "hold his own"; and that "he's not someone you messed around with." To the extent that the prosecutor's characterization of Dougoud as "a badass" was an expression of what she believed those evidentiary details reflected, a prosecutor may generally state what he or she believes from the evidence. "It is unquestionably the rule in Kentucky that counsel has wide latitude while making opening or closing statements." *Brewer v. Commonwealth*, 206 S.W.3d 343, 350 (Ky. 2006). "A prosecutor may comment on tactics, may comment on evidence, and may comment as to the falsity of a defense position." *Slaughter*, 744 S.W.2d at 412. Apart from that, the circuit court also admonished the jury to disregard the

prosecutor's "badass" comment. And, as before, Dougoud makes no argument that the circuit court's admonition was insufficient; or that the jury was unable to follow the admonition due to the applicability of either of the two exceptions discussed in *Carson*, 621 S.W.3d at 450.

Regarding the Commonwealth's statement during closing arguments that Dougoud had "killed before," the Commonwealth had already prefaced that detail – prior to Dougoud's objection – by stating it derived from "what you heard from [victim] on the stand." Nevertheless, following Dougoud's objection, the circuit court granted Dougoud all the relief he requested, directing the prosecutor to provide the jury with further clarification. Afterward, the Commonwealth once again explained that whether Dougoud had killed was not a proven fact, and that victim's understanding on that point solely derived from what he had testified Dougoud had told him. In short, the Commonwealth followed the circuit court's directive to Dougoud's apparent satisfaction, and it was abundantly clear that victim's testimony was the source of any valid evidence indicating Dougoud had killed in the line of duty. We see no real question of undue prejudice.

Lastly, with respect to Dougoud's recorded statement about "getting into fights," we cannot say that, taken in isolation, this brief statement raised any real question of prejudice; indeed, Dougoud did not request *any* admonition in this respect, and he was apparently satisfied when the circuit court granted him all the

relief he requested due to the statement. In sum, none of these purported individual errors themselves or cumulatively were substantial and Dougoud received all the relief to which he was entitled through admonishments and clarifications. Thus, reversal is not warranted due to cumulative error.

## CONCLUSION

We have addressed the breadth of Dougoud's appellate arguments. Finding no error, we affirm his conviction and sentence by the Campbell Circuit Court.

DIXON AND McNEILL, JUDGES, CONCUR IN RESULT ONLY.

BRIEFS FOR APPELLANT:

Steven Nathan Goens
Assistant Public Advocate
Frankfort, Kentucky

BRIEF FOR APPELLEE:

Daniel Cameron
Attorney General of Kentucky

James Havey
Assistant Attorney General
Frankfort, Kentucky