# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, RAP 40(D), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.

RENDERED: APRIL 18, 2024
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

## 2023-SC-0010-MR

JEFFREY ARINGTON                                       APPELLANT

                  ON APPEAL FROM CARLISLE CIRCUIT COURT
V.                   HONORABLE TIMOTHY A. LANGFORD, JUDGE
                                NO. 22-CR-00059

COMMONWEALTH OF KENTUCKY                       APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**AFFIRMING IN PART AND VACATING IN PART**

In September 2020, a minor child, M.S.[1], alleged that Jeffrey Arington raped her at his property in Carlisle County. A Carlisle County grand jury later indicted Arington on one count of first-degree rape, two counts of first-degree sodomy, one count of first-degree unlawful transaction with a minor, and one count of second-degree unlawful transaction with a minor. A two-day trial took place in September 2022, and a Carlisle County jury convicted Arington of all counts charged against him. The Carlisle County Circuit Court sentenced Arington to 51 years of imprisonment in accordance with the jury's recommendation. Arington now appeals to this Court as a matter of right, KY. CONST. 110(2)(b), and argues that (1) the trial court erred in denying his motions for directed verdicts of acquittal as to his rape and sodomy charges, (2)

---

[1] This Court will refer to the minor victim by her initials.

the trial court's instructions to the jury deprived him of his right to be free from double jeopardy, (3) the trial court erred in permitting a Kentucky State Police Sergeant to testify without first requiring the Commonwealth to lay the proper foundation for that testimony, and (4) during sentencing, the trial court erred in admitting victim impact statements from individuals who were not the victim. This Court vacates Arington's conviction for first-degree unlawful transaction with a minor, and affirms his remaining convictions.

## I. Background

M.S. is the cousin of Arington's son, and on September 17, 2020, M.S., then 15 years old, planned to visit Arington's farm in Carlisle County for the weekend. M.S. had been to Arington's farm on multiple occasions and had frequent interactions with Arington. Arington picked M.S. up from her home in Marshall County and drove her to his farm. According to M.S., Arington offered her multiple alcoholic beverages that he had in his truck during the drive to Carlisle County. M.S. testified that she was not an experienced drinker at the time, but drank four Smirnoff Ices. M.S. also testified that Arington offered her his marijuana pipe, and she took two hits from that pipe. According to M.S., Arington stopped at two different gas stations on their drive and purchased a case of beer at the second gas station. M.S. also testified that she drank three or four more Smirnoff Ices that Arington offered her. Upon arriving at Arington's farm, M.S. was told that she would be sleeping in a camper on the property. M.S. testified that she attempted to walk her dog before going into the camper, and that she was dizzy. M.S. testified that once she went inside the

2

camper she sat down on a couch and lost consciousness. She further testified that Arington entered the camper at some point during the night and she regained consciousness.

M.S. testified that Arington sat on the bed inside the camper, told her to come lay down on the bed, and instructed her to take her clothes off. M.S. testified that she complied and took her shorts and underwear off. M.S. also testified that she saw a handgun sitting on a nearby side table, but that she did not know whether the gun was loaded or not. M.S. testified that Arington then took her phone from her and placed it in another room. M.S. testified that Arington then pushed her legs apart and licked her vagina for a few minutes before putting on a condom and inserting his penis into her vagina. M.S. testified that Arington then grabbed the back of her head, put his penis inside her mouth, and used her head to move her mouth back and forth on his penis. M.S. testified that Arington grabbed and moved her head because she was falling asleep or was losing consciousness at the time. M.S. testified that Arington then pushed her legs up, got on top of her, and inserted his penis back into her vagina. M.S. testified that Arington ejaculated, told her to get dressed, and left the camper for the night.

M.S. testified broadly that she did not consent to any of the sexual acts that Arington performed on her or that he made her perform on him. Rather, when repeatedly asked by the Commonwealth whether she thought she might get hurt or be in danger if she did not go along with Arington's actions, M.S. answered affirmatively each time. She testified that her fear that Arington

3

would physically harm her was primarily induced by the gun she saw in the bedroom of the camper and the fact that Arington took her phone.

M.S. testified that she felt hungover the next morning and did not remember what had happened to her the night before. She testified that shortly after she woke up, Arington came into the camper and suggested that she shower. M.S. joined Arington and others on the farm for activities throughout that Friday, September 18, 2020. M.S. testified that at one point during the day she called her then-boyfriend, B.S., and told him she thought she had a bad dream. M.S. testified that she then realized that Arington had sexually assaulted her. B.S. advised M.S. to speak to her mother. However, M.S. testified that she did not call her mother until Saturday morning, September 19, 2020, once Arington had left the farm.

M.S.'s mother took her to a local hospital where she was examined by medical professionals who collected a sexual assault kit. Kentucky State Police Sergeant Aaron Jestes was dispatched to the hospital to meet with M.S. and her mother. He took possession of the sexual assault kit. Sgt. Jestes testified that after interviewing M.S., he went to Arington's property to interview Arington. Sgt. Jestes testified that Arington denied providing M.S. with alcohol and marijuana, denied having sex with M.S., and stated that he had slept in a residence that was in the process of being constructed on his property the night that M.S. alleged the sexual assault had occurred. With Arington's consent, Sgt. Jestes searched the property and collected a buccal swab from Arington, as well as bedding from the camper. Sgt. Jestes testified that he

4

found Smirnoff Ice and Bud Light beers in the refrigerator of the camper, but did not find any marijuana, drug paraphernalia, or a condom or its wrapper in his search. Sgt. Jestes also testified that he did not find any empty alcohol containers in Arington's truck. Sgt. Jestes also testified that M.S. had told him Arington had purchased Miller Lite beers at the gas station on their way to Arington's farm, but Sgt. Jestes never found any Miller Lite containers while searching the property.

Sgt. Jestes further testified that based on M.S.'s description, he was later able to locate the gas station in Graves County where Arington and M.S. had stopped on their drive. Sgt. Jestes testified that he obtained surveillance footage from a nearby car dealership that showed a red truck with identifying features similar to those on Arington's truck pull into the gas station on the evening of September 17. Sgt. Jestes obtained records and a receipt from the gas station that showed someone had purchased a pack of Miller Lite beers and a condom at 10:33 p.m. that evening. However, the age verification on the gas station receipt did not match Arington's birthdate.

M.S.'s sexual assault kit was sent to the KSP crime lab. There, analysts analyzed multiple swabs from M.S., a cutting from the panties that M.S. was wearing when she visited the hospital, and the buccal swab from Arington. Sgt. Jestes testified that M.S. had informed him that she and her then-boyfriend B.S. were sexually active with one another in the days or weeks prior to the sexual assault. Accordingly, the KSP crime lab also analyzed a buccal swab from B.S. A KSP analyst testified that semen was detected on M.S.'s

5

vaginal and external genital swabs, and that presumptive testing was positive for saliva detected on M.S.'s panties. Another KSP analyst testified that her tests revealed DNA from two different individuals was present on the cutting of M.S.'s panties. A different KSP analyst testified that DNA discovered on M.S.'s panties was consistent with Arington and his paternal relatives. She testified that the DNA match was 1,660 times more likely to occur if Arington or someone from his paternal line had contributed to the DNA profile.

Sometime after Sgt. Jestes spoke with Arington at his property, Arington went missing. Sgt. Jestes testified that a boat belonging to Arington was discovered mangled in a local river and that Arington's truck was located nearby. Sgt. Jestes testified that Arington was eventually discovered alive roughly a week later in the nearby woods. Arington's ex-wife, Summer Koons, testified that sometime after M.S. alleged that Arington had raped her, Arington sent Koons a letter in the mail, but told her not to read it. Koons testified that Arington implied the letter was a suicide note. Arington was eventually arrested after Sgt. Jestes received the KSP crime lab's analysis of M.S.'s sexual assault kit. After Arington's arrest, Koons read Arington's letter and gave it to Sgt. Jestes. That letter was admitted into evidence at Arington's trial. Relevantly, Arington wrote to Koons that, "There is evidence that I had intercourse with [M.S.]. If it's true, and I'm thinking it is, then I have lost everything including my soul, for I have caused a child to stumble."

In all, the Commonwealth called 10 witnesses during its case in chief and Arington called one witness of his own, his mother. At the close of the

6

Commonwealth's case, Arington moved for directed verdicts on each of his rape and sodomy charges. Arington later renewed that motion just prior to the trial court's reading of the jury instructions. The trial court denied both of Arington's motions. The jury deliberated for less than one hour, and found Arington guilty of each charged offense. The jury recommended Arington receive a 51-year aggregate sentence. Five individuals offered victim impact statements at Arington's final sentencing, and the trial court sentenced Arington to 51 years of imprisonment.

Arington now appeals to this Court.

## II. Motions for Directed Verdicts

Arington argues to this Court that he was entitled to directed verdicts of acquittal on his first-degree rape charge and both of his first-degree sodomy charges because the Commonwealth failed to present sufficient evidence of the necessary element of forcible compulsion. We now affirm the trial court's denial of Arington's motions for directed verdicts.

This Court solidified its directed verdict standard in *Commonwealth v. Benham*:

> On motion for directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purposes of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony.

7

816 S.W.2d 186, 187 (Ky. 1991). "So long as the Commonwealth produces more than a mere scintilla of evidence to support the charges, a defendant's motion for directed verdict should be denied." *Taylor v. Commonwealth*, 617 S.W.3d 321, 324 (Ky. 2020). "On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal." *Benham*, 816 S.W.3d at 187.

"A person is guilty of rape in the first degree when: (a) He engages in sexual intercourse with another person by forcible compulsion[.]" KRS 510.040(1)(a). "A person is guilty of sodomy in the first degree when: (a) He engages in deviate sexual intercourse with another person by forcible compulsion[.]" KRS 510.070(1)(a).

> "'Forcible compulsion' means physical force or threat of physical force, express or implied, which places a person in fear of immediate death, physical injury to self or another person, fear of the immediate kidnap of self or another person, or fear of any offense under this chapter. Physical resistance on the part of the victim shall not be necessary to meet this definition[.]"

KRS 510.010(2).

This Court has interpreted the statutes in KRS Chapter 510 to mean that "forcible compulsion must be the means by which a defendant secures sexual intercourse [or deviate sexual intercourse] with a victim for the conduct to qualify as first-degree rape [or first-degree sodomy]." *Yates v. Commonwealth*, 430 S.W.3d 883, 890 (Ky. 2014) Perhaps put more simply, the illicit sexual act "must be the result of an act or threat of physical force done by the defendant."

8

*Id.* As stated in KRS 510.010(2), forcible compulsion "can be accomplished in two ways: by physical force **or by threat of physical force.**" *Id.* (emphasis added). "In determining whether the victim felt threatened to engage in sex or feared harm from the attacker, a subjective test is applied[,]" meaning the statute does not require that the victim's fear be "reasonable." *Newcomb v. Commonwealth*, 410 S.W.3d 63, 80 (Ky. 2013) (citing *James v. Commonwealth*, 360 S.W.3d 189, 195 (Ky. 2012)); *Murphy v. Commonwealth*, 509 S.W.3d 34, 44 (Ky. 2017).

At trial, M.S. testified that Arington never "physically threatened her" and that he never told her "I'm going to hurt you"—but certain "cues" made her feel threatened before Arington raped and sodomized her, namely the presence of a handgun she saw on a table inside the camper and the fact that Arington took her phone from her and placed it in another room. We conclude this evidence was sufficient to support a finding of forcible compulsion and Arington's charges for first-degree rape and first-degree sodomy.

In regard to the handgun, M.S. testified that she saw the gun once she came into the bedroom of the camper where Arington was sitting. She testified that she did not know whether the gun was loaded but it caused her to be afraid. When asked whether it was unusual for there to be firearms present on Arington's property, M.S. testified, "No, but they were all in a safe. They were all rifles and shotguns. The one that was beside the bed was a handgun." She stated she felt threatened by the handgun because, "if a gun had gone off nobody would've suspected anything."

9

In regard to her phone, M.S. testified that she had access to her phone the entire time she was at Arington's property, except for the timeframe he took it from her while inside the camper. She further testified that Arington's act of taking her phone was the "number one" thing that caused her to feel threatened just prior to the rape and sodomy. M.S. also generally testified that "if a gun is just sitting there and your phone is taken, you know that that's a threat in general."

We have no trouble holding that the unusual presence of a handgun, outside of the safe where M.S. knew guns to be kept, and in the same room where Arington had instructed M.S. to lay down and remove her clothes, could have implicitly suggested to M.S. that Arington intended to harm her with that gun if she did not submit to his sexual advances. We observe this implicit threat or tacit understanding was undoubtedly bolstered by the fact that Arington took M.S.'s phone and removed it from the room where the handgun was located. This Court has previously noted a "gun lying within reach" of a Defendant as being contributory to a finding of forcible compulsion. *See May v. Commonwealth*, No. 2005-SC-000653-MR, 2007 WL 2404445, *5 (Ky. Aug. 23, 2007) ("[Victim] testified that Appellant intimidated her and her mother into making a video of Appellant and [Victim] having sex because Appellant had a gun lying within reach."). M.S.'s testimony regarding the handgun was certainly more than the "scintilla" required to prove that Arington had made an implied threat to physically harm her if she did not acquiesce to his actions. *Taylor*, 617 S.W.3d at 324.

10

Arington argues that previous statements M.S. made to Sgt. Jestes denying that Arington ever threatened her should overcome her trial testimony that she was threatened. However, we conclude that the jury was entitled to believe whichever pieces of the conflicting evidence that it found credible. In ruling on Arington's directed verdict motions, the trial court was required to reserve all questions of credibility and weight to the jury. *Benham*, 816 S.W.2d at 187.

Accordingly, it was not clearly unreasonable for the jury to make a finding of forcible compulsion, and we affirm the trial court's denial of Arington's motions for directed verdicts of acquittal as to his first-degree rape and first-degree sodomy charges.

### III.    Double Jeopardy Violation

Arington now argues that the trial court's instructions to the jury lacked necessary specificity and required the jury to make inconsistent findings of fact, thus depriving him of his right to be free from double jeopardy. Arington concedes that he did not previously object to the trial court's jury instructions on double jeopardy grounds and requests palpable error review pursuant to Kentucky Rule of Criminal Procedure (RCr) 10.26. "A palpable error is one resulting in 'manifest injustice,' i.e. a 'probability of a different result or error so fundamental as to threaten a defendant's entitlement to due process of law.'" *Hunt v. Commonwealth*, 326 S.W.3d 437, 440 (Ky. 2010) (quoting *Martin v. Commonwealth*, 207 S.W.3d 1, 3 (Ky. 2006)). This Court has previously held that double jeopardy violations result in manifest injustice and warrant

11

reversal of conviction. *Towe v. Commonwealth*, 617 S.W.3d 355, 358-59 (Ky. 2021) (citing *Cardine v. Commonwealth*, 283 S.W.3d 641, 652 (Ky. 2009)).

The trial court instructed the jury on one count of first-degree rape (Instruction No. 5) and one count of first-degree unlawful transaction with a minor (Instruction No. 6). The jury convicted Arington of both counts. Arington now alleges that the trial court's instructions as to these counts were so unspecific as to allow the jury to convict him of both crimes for the same criminal act: one act of "sexual intercourse."

> "'Sexual intercourse' means sexual intercourse in its ordinary sense and includes penetration of the sex organs of one person by any body part or a foreign object manipulated by another person. Sexual intercourse occurs upon any penetration, however slight; emission is not required. 'Sexual intercourse' does not include penetration of the sex organ by any body part or a foreign object in the course of the performance of generally recognized health-care practices[.]"

KRS 510.010(8). The trial court instructed the jury as to this definition in Instruction No. 4.

As previously stated, a conviction of first-degree rape requires a finding that the defendant engaged in "sexual intercourse" either "with another person by forcible compulsion" or "with another person who is incapable of consent." KRS 510.040(1). The trial court's instruction on first-degree rape, Instruction No. 5, stated as follows:

> You, the Jury, will find Defendant, Jeffrey R. Arington, guilty under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:
> > A. That in this county on or about the 17-18th day of September, 2020 and before the finding of the Indictment herein, the Defendant, Jeffrey R. Arington, engaged in **sexual intercourse** with M.S., a minor;

12

AND
B. That the Defendant, Jeffrey R. Arington, did so by forcible compulsion.

(Emphasis added).

Alternatively, a conviction of first-degree unlawful transaction with a minor requires a finding that the defendant "knowingly induce[d], assist[ed], or cause[d] a minor to engage in" either "(a) Illegal sexual activity" or "(b) Illegal controlled substances activity other than activity involving marijuana or salvia . . . ." KRS 530.064(1). This Court has previously held that the statute's phrase, "'to induce' signifies a successful persuasion; that the act has been effective and the desired result obtained, and that 'to engage' denotes action and means to employ one's self; to take part in. Thus, to complete the offense, the minor must **consent to and actively participate in the activity**." *Combs v. Commonwealth*, 198 S.W.3d 574, 578 (Ky. 2006) (emphasis added) (internal quotation marks and citations omitted) *overruled on other grounds by Ray v. Commonwealth*, 611 S.W.3d 250 (Ky. 2020). Assumedly, the trial court attempted to reflect this interpretation of the statutory language in Instruction No. 4, when it defined "illegal sexual activity" for the jury as, "Any and all consensual sexual contact with a minor under the age of Sixteen (16)." However, the trial court's remaining instructions curiously never referenced "illegal sexual activity" or consent again. Rather, the trial court's instruction on first-degree unlawful transaction with a minor, Instruction No. 6, stated as follows:

You will find the Defendant, Jeffrey R. Arington, guilty of Unlawful Transaction With a Minor First Degree, Illegal Sex

13

Act, Under 16 Years of Age, under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:

   A. That in this county from on or about the 17-18th day September 2020, and before the finding of the indictment herein, the Defendant Jeffrey R. Arington, knowingly induced, assisted or caused the minor, M.S. to engage in **sexual intercourse**; AND

   B. That M.S. was less than 16 years of age; AND

   C. That the Defendant, Jeffrey R. Arington, knew that M.S. was less than 16 years of age.

(Emphasis added).

We have no doubt that an act of "sexual intercourse," as defined in KRS 510.010(8) and Instruction No. 4, could constitute the requisite sexual activity needed to convict Arington of unlawful transaction with a minor under Instruction No. 6. However, the trial court's conditioning of liability on a finding of "sexual intercourse" without differentiating this act of sexual intercourse from the act of sexual intercourse needed to convict Arington of first-degree rape created an opportunity for a double jeopardy violation.

At trial, M.S. testified to four distinct acts of sexual contact: that Arington had licked her vagina (deviate sexual intercourse), penetrated her vagina with his penis (sexual intercourse), put his penis in her mouth (deviate sexual intercourse), and penetrated her vagina with his penis again (sexual intercourse). In light of the trial court's failure to differentiate between the two acts of sexual intercourse referenced in its instructions, it is entirely possible that the jury might have convicted Arington of first-degree rape and first-degree unlawful transaction with a minor for one singular act of sexual intercourse.

14

We note that the trial court's remaining instructions did not instruct the jury that it was prohibited from considering the same act on multiple counts, nor did the Commonwealth seek to differentiate the instructions during its closing argument.

The Double Jeopardy Clause of the Fifth Amendment of the United States Constitution, Section 13 of the Kentucky Constitution, and KRS 505.020, generally preclude the Commonwealth from convicting a criminal defendant of multiple offenses for the same criminal act. *Towe v. Commonwealth*, 617 S.W.3d at 358. KRS 505.020(1)(b) specifically prohibits the prosecution of multiple offenses arising from the same criminal act when "[i]nconsistent findings of fact are required to establish the commission of the offenses[.]" Here, it is readily apparent that inconsistent findings of fact would be required to find that Arington both forcibly compelled M.S. to engage in an act of sexual intercourse (first-degree rape) and knowingly induced, assisted, or caused M.S. to consensually engage in the same act of sexual intercourse (first-degree unlawful transaction with a minor). Forcible compulsion in and of itself is evidence of lack of consent. *Yates*, 430 S.W.3d at 889. Thus, because this Court has no assurance that the jury did not premise Arington's liability for both crimes on the same act of sexual intercourse, and those crimes require inconsistent findings of fact, a double jeopardy violation necessarily arises. Even assuming that the jury properly attributed each crime to a separate, distinct act of sexual intercourse, we are equally as certain that such a verdict could not stand. There was no evidence elicited at trial that could have led a

15

reasonable jury to believe that M.S. had consented to engage in one act of sexual intercourse but was forcibly compelled to engage in the other.

The remedy for statutory double jeopardy violations involving inconsistent findings of fact is to vacate the conviction for the lesser offense. *Kiper v. Commonwealth*, 399 S.W.3d 736, 746 (Ky. 2012). Because both convictions carry a Class B Felony designation, we vacate the offense with the lesser sentence: first-degree unlawful transaction with a minor.

## IV. Sgt. Jestes's Testimony Regarding Gas Station Receipt

Arington now argues that the trial court abused its discretion in admitting certain testimony from Sgt. Jestes regarding the alcohol sales receipt he had obtained from the gas station where Arington allegedly stopped with M.S. on their way to Arington's property. The Commonwealth concedes this issue is preserved for this Court's review. We review the trial court's decisions to admit evidence for an abuse of discretion. *Goodyear Tire & Rubber Co. v. Thompson*, 11 S.W.3d 575, 577 (Ky. 2000). A trial court abuses its discretion when its decision is arbitrary, unreasonable, unfair, or unsupported by sound legal principles. *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

Sgt. Jestes testified that after he determined which gas station Arington and M.S. had stopped at on their drive, he obtained records and a receipt from that gas station that showed someone had purchased a pack of Miller Lite beers and a condom at 10:33 p.m. the same evening. However, the age verification on the gas station receipt did not match Arington's birthdate. The Commonwealth, nonetheless, introduced the receipt into evidence. On re-

16

direct, the Commonwealth asked Sgt. Jestes whether it was a "common occurrence" for birthdates not to match the age verification on alcohol receipts at gas stations. Sgt. Jestes responded by testifying that he himself had asked the gas station clerk whether he always checked IDs when he made alcohol sales. Before Sgt. Jestes could testify as to the clerk's response, defense counsel objected on hearsay grounds, as well as whether the Commonwealth had laid the proper foundation for Sgt. Jestes to testify as to the commonality of incorrect birthdates on gas station alcohol sales receipts. At the ensuing bench conference, the trial court stated that Sgt. Jestes could testify as to his experience, and overruled the objection. The Commonwealth then reframed its question and asked whether Sgt. Jestes had known of other gas station alcohol sales receipts that did not list the purchaser's correct birthdate. Sgt. Jestes answered affirmatively.

Arington now characterizes Sgt. Jestes's brief testimony on this matter as a violation of Kentucky Rule of Evidence (KRE) 702 which governs expert witness testimony. However, we conclude that Sgt. Jestes did not offer any "scientific, technical, or other specialized knowledge" that rendered his testimony that of an expert witness. KRE 702. Rather than testify whether it was a "common occurrence" for purchasers' birthdates to not match the age verification on gas station alcohol sales receipts, Sgt. Jestes merely testified to his own experience with such receipts, i.e., that he had in fact known of other receipts that did not correctly list the purchaser's birthdate. Sgt. Jestes did not offer any testimony about the general practices of gas station clerks or any

17

other specialized knowledge. His testimony was clearly based on his own personal knowledge and admissible pursuant to KRE 602. "As a general rule, a competent witness may testify concerning matters of which he has personal knowledge, including events he has personally observed and perceived." *Ruiz v. Commonwealth*, 471 S.W.3d 675, 683 (Ky. 2015) (citing KRE 602; *Marshall v. Commonwealth*, 60 S.W.3d 513, 520 (Ky. 2001)).

Accordingly, the trial court did not abuse its discretion in admitting this evidence.

### V.    Victim Impact Statements

Finally, Arington argues that the trial court erred when it permitted multiple individuals who were not "victims," as statutorily defined by KRS 421.500, to present victim impact statements during his final sentencing. Arington concedes this issue is only partially preserved and requests palpable error review pursuant to RCr 10.26.

After the jury returned its verdict, it recommended that Arington receive a 20-year sentence for his first-degree rape conviction, 10-year sentences for each of his first-degree unlawful transaction with a minor and first-degree sodomy convictions, and a one-year sentence for his second-degree unlawful transaction with a minor conviction. The jury recommended that Arington serve his sentences consecutively for an aggregate sentence of 51-years' imprisonment. After the trial court received the jury's sentencing recommendation, it set a subsequent date for final sentencing following a presentence investigation.

18

At Arington's final sentencing in December 2022, defense counsel stated that he had no objection to the reading of victim impact statements prior to the imposition of the sentence. The trial court then permitted five individuals to read written victim impact statements: first M.S., followed by M.S.'s mother, then Arington's ex-wife Summer Koons, then a woman who only identified herself as "[A.K.'s]" grandmother[2], and finally, M.S.'s aunt, the mother of Arington's son. After the fourth statement, defense counsel objected and stated that the Commonwealth had stretched the definition of the term "victim." At this point, certain statements made by the individuals had been emotionally charged and accusatory. The trial court overruled the objection and permitted the last woman to read her statement. Arington now argues that M.S. and her mother were the only "victims" statutorily entitled to present victim impact statements at his final sentencing, and thus the trial court erred when it permitted the remaining individuals to give their own statements.

KRS 421.520(1) states that the "victim has the right to submit a written victim impact statement to the probation officer responsible for preparing the presentence investigation report for inclusion in the report or to the court should such a report be waived by the defendant." The statute also requires that the victim's impact statement "shall be considered by the court prior to

---

[2] This woman did not read her own victim impact statement, but rather a statement written by someone else. Based on the content and context of the statement, we assume the author of the statement to be Summer Koons's daughter and we use initials to protect her identity. A.K.'s grandmother stated that A.K. could not attend the sentencing and asked her to read the statement she had prepared.

any decision on the sentencing . . . of the defendant." KRS 421.520(3). KRS 421.500(1)(a)(1) relevantly defines a "victim" as "an individual directly and proximately harmed as a result of . . . . The commission of a crime classified as a felony[.]"

> If the victim is a minor, incapacitated, or deceased, "victim" also means one (1) or more of the victim's spouse, parents, siblings, children, or other lawful representatives which shall be designated by the court unless the person is the defendant or a person the court finds would not act in the best interests of the victim.

KRS 421.500(1)(a).

Here, it is readily apparent that M.S., a minor, and her mother were the only statutorily defined "victims" with a right to present a written victim impact statement to be considered by the trial court prior to its sentencing decision. This Court has previously held that allowing others outside the statutorily defined list of victims to give impact statements during the penalty phase of a defendant's trial does constitute error. *See McGuire v. Commonwealth*, 368 S.W.3d 100, 112 (Ky. 2012); *Elery v. Commonwealth*, 368 S.W.3d 78, 98 (Ky. 2012). Where these statements are admitted after the penalty phase, at final sentencing, we have once stated that the trial court retains the discretion to consider impact statements from other individuals affected by the crime. *Sherroan v. Commonwealth*, 142 S.W.3d 7, 24 (Ky. 2004). Arington argues that the three individuals, aside from M.S. and her mother, who gave impact statements were not so affected by his crimes as to permit a reading of their statements. However, we see no need to pronounce whether admission of these statements constituted error after the jury had given its sentencing

20

recommendation, because it is abundantly clear that no manifest injustice resulted from the admission of these statements. Not only did the trial court sentence Arington in accordance with the jury's recommendation—which we note was not affected by the allegedly prejudicial victim impact statements—but Arington also received minimum sentences on four of the five counts of which he was convicted.[3]

## VI. Conclusion

Having concluded that Arington's conviction for first-degree unlawful transaction with a minor constituted a double jeopardy violation, we vacate that conviction and its corresponding sentence. We affirm the trial court in all other respects.

All sitting. VanMeter, C.J.; Bisig, Conley, Keller, Lambert and Nickell, JJ., concur. Thompson, J., concurs in result only.

---

[3] Arington received minimum sentences of 10-years' imprisonment on his first-degree unlawful transaction with a minor conviction, as well as both of his first-degree sodomy convictions. Arington also received the minimum one-year sentence on his second-degree unlawful transaction with a minor conviction.

21

COUNSEL FOR APPELLANT:

Emily Holt Rhorer
Assistant Public Advocate

COUNSEL FOR APPELLEE:

Russell M. Coleman
Attorney General of Kentucky

Thomas Allen Van De Rostyne
Assistant Attorney General